**Frank B. SHORT and Katherine F. Short, and Richard L. Coleman and Betty B. Coleman, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 8444.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 17, 1961.

Decided April 3, 1962.

Int.Rev.Code of 1939, § 117(m), 26 U.S.C.A. § 117(m). Taxpayers contend that certain funds received by them in 1950 should be treated as long-term capital gains. They here petition for review of the Tax Court's determinations that these funds are taxable as ordinary income. The cases were consolidated on appeal by order of this court. We agree with the Tax Court that the two corporations are collapsible within the meaning of subsection 117(m) (2) (A) and that the distributions to the taxpayers are properly taxed as ordinary income.

The primary legal issues here are not new. This court has recently decided Spangler v. Commissioner, 278 F.2d 665 (4th Cir.), cert. denied, 364 U.S. 825, 81 S.Ct. 63, 5 L.Ed.2d 54 (1960), where the facts were quite similar to those here. We have had other occasions to consider the tax treatment to be accorded gains to individual taxpayers from collapsible corporations.[1] We, therefore, do not think it necessary to discuss in detail the governing principles which are here applied. Two apartment housing projects are involved, and the salient facts as to each will be recited. A more complete development of the facts can be found in the Tax Court's joint opinion reported at 35 T.C. 922, (No. 103) (1961).

### Edgewood Knoll Project

Edgewood Knoll Apartments, Inc., was created under the laws of North Carolina on September 28, 1949, for the purpose, among other things, of constructing and operating a rental housing project. Its authorized capital was $350,000, consisting of 100,000 shares of $1 par value Class A common stock, 2499 shares of $100 par value Class B common stock and 100 shares of $1 par value preferred stock. On October 10, 1949, at the first meeting of the incorporators and subscribers to the capital stock, 100 shares of Class A stock were issued to each of the three following named persons: R. L. Coleman, F. B. Short and Z. B. Robin-

W. Y. Wilkins, Jr., Tryon, N. C., for petitioners.

David O. Walter, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, on brief), for respondent.

Before SOPER, BOREMAN and BRYAN, Circuit Judges.

BOREMAN, Circuit Judge.

We are concerned with two "collapsible corporations" within the meaning of

1. Pomponio v. Commissioner, 288 F.2d 827 (4th Cir. 1961); Bryan v. Commissioner, 281 F.2d 238 (4th Cir. 1960), cert. denied, 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364 (1961); and Burge v. Commissioner, 253 F.2d 765 (4th Cir. 1958).

son.[2] On the same day these three were elected as directors. All the preferred stock was issued to the Federal Housing Administration, and the Class B stock, with which we are here primarily concerned, was issued as follows:

| No. of shares | Name of Shareholder | |
| --- | --- | --- |
| 494.51 | William G. Lyles, Bissett, Carlisle & Wolff | Consideration given Services |
| 313.67 | F. B. Short | Land |
| 313.67 | R. L. Coleman | Land |
| 313.67 | Z. B. Robinson | Land |
| 64.16 | R. L. Coleman | Cash |
| 64.16 | F. B. Short | Cash |
| 64.16 | Z. B. Robinson | Cash |

Architects for the project were William G. Lyles, Bissett, Carlisle & Wolff from Columbia, South Carolina.[3] It was agreed that their fee for work in connection with Edgewood Knoll would be $64,451, of which $15,000 was to be paid in cash and the balance in Edgewood Knoll Apartments, Inc.'s, Class B common stock having a par value of $49,451. The prime contractor was a corporation controlled by Robinson. Land was acquired from the three project sponsors (Coleman, Short and Robinson) in exchange for Class B stock having a par value of $94,100. The sponsors' cost of the land was $94,100.

On October 10, 1949, the corporation obtained a bank loan of $1,283,000, secured by an FHA-approved mortgage. That same day construction on the Edgewood Knoll project began; it was finished on December 15, 1950. Prior to final completion, however, several units were available for occupancy and were rented, the rental payments starting in March 1950. In the FHA project analysis, it was anticipated that Edgewood Knoll would produce a net yearly income of $85,166.

On December 3, 1949, the architects offered by letter to sell their 494.51 shares of Class B stock (par value $49,451) to Coleman, Short and Robinson for $10,660 in cash, provided they (the architects) received, prior to January 1, 1950, the unpaid balance ($13,500) of their cash fee which had been agreed upon. On December 29, 1949, each of the offerees issued his personal check for $3,553.33 to the architects and received one-third of the 494.51 shares of the Class B stock.

On November 30, 1950, the books of Edgewood Knoll showed that the corporation had paid a total construction cost of $1,175,810.99, including the cost of land, buildings and equipment. Included in this figure is $49,451 representing the shares of Class B stock issued to the architects for part of their fee. On November 30, by journal entry on the corporate books, an appreciation surplus account was set up and credited with $178,909.01 to reflect an FHA appraisal of the Edgewood Knoll property. Corresponding debits were made to the land account and to the building and equipment account.

2. Robinson is not a party to this action. Katherine Short and Betty Coleman, respective wives of F. B. Short and R. L. Coleman, are parties only because joint returns were filed.

3. We note with more than passing interest that this same architectural firm was involved in the Spangler case, supra (278 F.2d 665).

On December 29, 1950, Edgewood Knoll redeemed all outstanding shares of its Class B common stock, which were then owned by Coleman, Short and Robinson. Each of the three men received $68,000 cash in the redemption. The difference between the par value of the stock redeemed ($162,797) and the redemption price ($204,000) was charged on the books of Edgewood Knoll to the appreciation surplus account created by the journal entries of the preceding November 30.

With the exception of two years, losses were reported by Edgewood Knoll on its federal income tax returns for all years from the time of corporate organization through December 31, 1958. The Tax Court found that Edgewood Knoll, at the time the Class B stock was redeemed, had not realized a substantial part of the net income to be derived from the property and found it to be a collapsible corporation within the definition of Int. Rev.Code of 1939 § 117(m) (2) (A), i. e., that the corporation was formed or availed of principally for the manufacture, construction or production of property with a view to (1) a distribution to taxpayers, prior to the realization by Edgewood Knoll of a substantial part of the net income to be derived from the property; and (2) the realization by taxpayers of gain attributable to the property.

*Coleman Apartments Project*

Approximately the same procedures were followed in connection with the second newly formed corporation, Coleman Apartments, Inc., which was organized by Coleman and Short on August 20, 1949, for the purpose of constructing and operating a rental housing project. Robinson had no interest therein, and all the stock initially issued was issued to Short and his wife, Coleman, the FHA and the architects.

On or about August 19, 1949, taxpayers purchased for $16,000 a tract of land; the next month the land was conveyed to the corporation for 400 shares of Class B common stock in Coleman Apartments, Inc., having a par value of $40,000, the FHA-appraised value of the land. The same firm of architects involved in the Edgewood Knoll project was employed and planned this one. It was agreed that the architects' fee for Coleman Apartments would be $72,334, of which $10,000 was to be paid in cash and the balance in the corporation's Class B common stock having a par value of $62,334. This stock was later sold by the architects to Coleman and Short for $5,440.

On September 6, 1949, the corporation signed a contract (with a corporation controlled by Coleman) for construction of the apartment building on the land conveyed to Coleman Apartments, Inc., by Coleman and Short. That same day this corporation obtained a bank loan for $772,000, which was secured by an FHA-guaranteed mortgage. In the FHA project analysis, it was estimated that Coleman Apartments would produce an annual net income of approximately $50,984.

On December 30, 1950, Coleman Apartments, Inc., redeemed all of the outstanding shares of its Class B common stock, which were owned by Coleman and Short. Each stockholder received $64,000 cash in the redemption. The difference between the par value of the redeemed stock and its redemption price was charged to an appreciation surplus account set up on the books of the corporation as in the case of Edgewood Knoll.

The corporation reported losses on its federal income tax returns for each year of its existence through 1956, when a mortgage default resulted in foreclosure. During those years a management fee of 5% of rents received was paid to the R. L. Coleman Company, a corporation controlled by taxpayers. For some of those years, salaries were paid to taxpayers or members of their families.

The Tax Court found that Coleman Apartments, Inc., redeemed its Class B common stock prior to the realization of a substantial part of the net income to be derived from the property and found it to be a collapsible corporation within

the meaning of Int.Rev.Code of 1939 § 117(m) (2) (A).

On these facts there are three issues presented: (1) Whether with respect to Coleman Apartments, Inc., the stock redemption occurred prior to the realization by the corporation of a substantial part of the net income to be derived from the property constructed; (2) whether the Tax Court erred in determining that more than 70% of the gain realized by taxpayers upon redemption of their Class B stock in both corporations was attributable to the property constructed, thus rendering subsection 117(m) (3) (B) inapplicable; and (3) whether, with respect to both corporations, the gains realized by the taxpayers upon redemption of their Class B stock are to be measured by the difference between the amount received and the cost or other tax basis of the stock to (a) themselves or (b) to the corporation involved.

—I—

■ Under Int.Rev.Code of 1939 § 117(m) (2) (A), a collapsible corporation is defined as

" * * * a corporation formed or availed of principally for the manufacture, construction, or production of property * * * with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property."

Taxpayers here argue that Coleman Apartments, Inc., does not come within the statutory definition because the corporation never made a profit while it owned the rental property. It is argued that since the corporation had *no* net income after the distribution or redemption, the statute does not apply.

There is no merit to this argument. In Spangler v. Commissioner, supra (278 F.2d 665 at 671), we pointed out that the statute does not require that net income from the constructed property should in fact develop subsequent to the distribution, if the corporation has been "availed of" with a view to making the distribution prior to the corporation's realization of a substantial part of net income. In other words, if the corporation is "formed or availed of" with the requisite "view" prior to the realization of a substantial portion of anticipated net income, it is a collapsible corporation. See Payne v. Commissioner, 268 F.2d 617, 622 (5th Cir. 1959) (dictum); cf. Heft v. Commissioner, 294 F. 2d 795 (5th Cir.1961). The Tax Court found that Coleman Apartments, Inc., was formed or availed of with the requisite "view." In our opinion such finding is not clearly erroneous, and that corporation is collapsible within the meaning of the statute.

—II—

■ Taxpayers next contend that even if the corporations were collapsible within the meaning of subsection 117(m) (2) (A), the limitation of subsection 117 (m) (3) (B) applies to prevent treatment of the gain as ordinary income rather than as capital gain. The latter subsection provides that—

"In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

"(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, [or] produced * * *; * * *"

It is argued by taxpayers that at least 30% of the gain realized was not attributable to the property constructed but rather was attributable to factors having nothing to do with the constructed property. With respect to Coleman Apartments, Inc., taxpayers claim that their realized gain in 1950 was properly

attributed to (1) the profit on their transfer of land to the corporation in 1949 (they now claim the gain should have been *recognized* in 1949, though no gain was reported on their 1949 income tax returns from transfer of the land to the corporation in exchange for stock therein), and (2) the "favorable purchase of the architect's stock" for a sum substantially less than its par value. The decisive portion of the gain (i. e., at least 30%) realized from the redemption of Edgewood Knoll Apartments, Inc., stock is said to be attributable to the taxpayers' purchase of the architects' stock (same as point (2) in preceding sentence).

Substantially this same argument has been presented and rejected in Payne v. Commissioner, 268 F.2d 617, 621 (5th Cir. 1959); Spangler v. Commissioner, 278 F.2d 665, 670 (4th Cir.), cert. denied, 364 U.S. 825, 81 S.Ct. 63, 5 L.Ed.2d 54 (1960); and Burge v. Commissioner, 253 F.2d 765, 769–70 (4th Cir. 1958).

The Tax Court based its decision on a finding that taxpayers realized no gain upon the transfer of the land to Coleman Apartments, Inc., or from the purchase of the architects' stock in both corporations. We make no determination with respect to the Tax Court's finding concerning the gain from the purchase of the architects' stock; the land transfer is discussed in Part III to follow. The court's ultimate conclusion can be sustained, however, on another ground. Looking to substance and not merely to form, the entire gain here involved resulted from the Class B stock redemption by both corporations. Neither corporation would have had funds for the redemption had not the FHA-approved loans been for amounts in excess of the actual costs of constructing the rental properties. Thus, without the construc-

tion, there would have been no loan and no "extra" cash for the stock redemption. The Tax Court was justified in finding that more than 70% of the realized gain was attributable to the constructed property, thus making subsection 117(m) (3) (B) inapplicable.

—III—

Taxpayers' last argument, as we understand it, is that their "collapsible gain" should be measured by the difference between the redemption price of the stock and the value of the consideration received by the corporation, as determined by its board of directors, for the original issue of the stock, not the price at "which some of the stock sold for outside the corporate structure." No authority for this proposition is offered, and certainly subsection 117(m) does not sanction such a method of determining gain. It is somewhat unartfully explained by taxpayers in their reply brief that by this argument they meant to assert that they had realized a gain of $24,000 in 1949 upon the transfer of land (acquired by Coleman and Short for $16,-000) to Coleman Apartments, Inc., in exchange for 400 shares of that corporation's stock having a par value of $40,000 and that such gain should have been recognized in 1949 under Int.Rev.Code of 1939 §§ 112(b) (5) and 112(h). The Tax Court found as fact that taxpayers realized no gain in 1949 on the transfer of the land to Coleman Apartments, Inc., and thus did not consider the applicability of subsections 112(b) (5) and 112 (h). We cannot say that the Tax Court's finding on this point is clearly erroneous. Taxpayers argue that the Commissioner and Tax Court were bound, under North Carolina law,[4] to accept the value of the land placed upon it by the board of directors of Coleman Apartments, Inc., the

4. " * * * In the absence of fraud or bad faith, the judgment of the directors as to the value of the consideration received for shares shall be conclusive. * * * " Gen.Stat. of N.C. § 55–46 (1960).

Gen.Stat. of N.C. § 55–62 (1950), in effect at the time of the transactions at bar, contains the following provision: " * * * Any corporation may issue stock for * * * real estate, * * * and, in the absence of fraud in the transaction, the judgment of the directors as to the value of such * * * real estate * * * shall be conclusive."

vendee of the land in question. The Commissioner apparently agrees that North Carolina law applies but disagrees with taxpayers on the effect of that law on this case. Assuming, *arguendo,* that North Carolina law is applicable, we find that the North Carolina Supreme Court has interpreted the statute on which taxpayers rely in such a manner that the Tax Court was justified in ignoring the determination by the board that the land was worth $40,000, when only a few weeks prior to sale to the corporation the land had been purchased by two of the three directors [5] for only $16,000. In Goodman v. White, 174 N.C. 399, 93 S.E. 906 (1917), a trustee in bankruptcy for a bankrupt corporation brought an action against one of the corporation's stockholders to recover $8200 allegedly due but not paid on a stock subscription. The stockholder defended the suit on the ground that property worth the par value of the stock received had been transferred to the corporation in exchange for the stock. The court there condemned a purchase of property from the defendant, a board member, by the corporation. The board member, in effect, purchased certain property for $4000 and shortly thereafter sold it to the corporation for stock having a par value of $12,200. "Such a transaction as that cannot be upheld. It is contra bonos mores, and against sound public policy as well as the statutes of this state," said the court in that case, 93 S.E. at 907. Other language of the opinion is also pertinent here:

> "The burden of proof upon a plea of payment is on the one pleading it, the defendant in this case. He admits that the stock was not paid for in money, but in property. He must therefore establish that the property was taken in payment at its true value, and further that such value was approved by a board of directors acting independently in the interest of the corporation, whose

judgment is conclusive except in case of fraud." Id. at 908.

The North Carolina court held that the two conditions necessary to sustain the burden of proof were not met in Goodman. We, like the Tax Court, do not think taxpayers here have met the burden imposed upon them by North Carolina law. It is argued that the FHA, a Government agency which was not controlled by taxpayers in any sense, independently valued the land at $40,000, which amount was merely adopted by the board of directors as the fair market value of the land at the time it was acquired from Coleman and Short. But the Tax Court was not bound to accept the determination of the FHA since the history of several similar projects reveals that, for loan guarantee purposes, rental properties constructed under section 608 of the National Housing Act, 12 U.S.C.A. § 1743, have been overvalued by FHA (as were the two apartment buildings in the case at bar). See, for example, Spangler v. Commissioner, supra, the cases in footnote 1 of this opinion, and the numerous other cases dealing with collapsible corporations in which FHA has been involved.

We have examined sections 111 through 113, where definitions of "gain" and "basis" are found, yet nowhere in those sections do we find any justification for permitting the individual taxpayers here to use any basis for the stock other than their own costs of acquisition. The Coleman Apartments, Inc., stock issued to taxpayers in exchange for land was acquired for $16,000, the amount as found by the Tax Court to be the land's true market value as of the date of exchange. The basis for the stock acquired from the architects is the amount actually paid therefor by the taxpayers. The value placed by the corporations on the services rendered by the architects in exchange for the stock is irrelevant to a determination of the taxpayers' basis in such stock. Gain in this case is correctly computed by de-

---

5. Board members were Short, Coleman and Mrs. Coleman.

termining the amount received from the collapsible corporations in redemption of the stock in excess of the amount actually paid for the stock by the taxpayers.

For the foregoing reasons, the decisions of the Tax Court are

Affirmed.