**Jack and Celia FARBER, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 12, Docket 27436.**

United States Court of Appeals
Second Circuit.

Argued Oct. 31, 1962.

Decided Jan. 11, 1963.

Bernard J. Long, Washington, D. C. (Dow, Lohnes & Albertson), Washington, D. C. (Richard P. Milloy, Washington, D. C., on brief), for petitioners.

David O. Walter, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice), Washington, D. C., for respondent.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Jack and Celia Farber, the latter of whom is involved only through the filing of joint returns, petition for review of a decision of the Tax Court, 36 T.C. 1142 (1961), by Judge Atkins, review of which by the full court evoked a dissent from Judge Drennen. The issue is whether the gain realized by Farber (sometimes hereafter "the taxpayer" or "petitioner") from the sale of 100 shares of Eagle Mount Corporation, comprising all of that corporation's capital stock, was gain on the sale of a capital asset held for more than six months, as he contends, or whether, as the Tax Court held, it came within the "collapsible corporation" amendment, § 117(m), added to the Internal Revenue Code of 1939 by § 212(a) of the Revenue Act of 1950, c. 994, 64 Stat. 906, and amended by § 326(a) of the Revenue Act of 1951, 65 Stat. 452, and hence was taxable as ordinary income. We accept the Tax Court's conclusion and affirm.

The facts in summary are as follows: Farber, who was engaged in various real estate activities, formed Eagle Mount Corporation in May, 1950, initially for a purpose not here relevant. He was its sole stockholder, and he and his wife were its directors. In July, 1951, he entered into a contract, later assigned to Eagle Mount, for the purchase of an unimproved tract of land on Long Island just west of the Mitchell Air Force Base.

The seller had attempted to develop adjacent property still further west with one-family houses, in the price range of $15,000–$18,000, without much success; Farber believed that developing the tract with lower-price houses might be successful.

In May, 1952, the sale of the tract was consummated; Eagle Mount paid $7,202.-46, advanced to it by Farber, and delivered its note for $35,500, secured by a purchase money mortgage. Thereafter Eagle Mount, or Farber on its behalf, set about the intended development program. An architect was retained to revise the map of the tract to show 60-foot instead of 20-foot lots in order to meet a local zoning ordinance, and was paid $300 on account. Application was made to the village of Garden City for permits to erect 29 houses and for the necessary water and sewer arrangements and street improvements; this entailed the payment of $3,581.50 as fees for the building permits, the filing of a bond (for which a $546 premium was paid) to secure payment for the improvements, and the payment of $6,200 as a deposit for the purchase of water materials and of $1,334 as an advance for utility connections. Eagle Mount also filed applications with the Federal Housing Administration for conditional loan-insurance commitments under Title II, § 203 of the National Housing Act, 12 U.S.C. § 1709(i), and paid filing fees of $1,305. All these sums, totaling $13,266.50, were advanced by Farber. None of these activities had resulted in any physical changes in the tract at the date of the agreement referred to below.

Between May and November, 1952, Farber was approached by representatives of two brothers, Bernard and Albert Genchi, who wished to acquire his project. Negotiations ultimately resulted in an agreement dated November 18, 1952, whence this litigation stems. In order to carry out the proposed agreement, Farber and the Genchi brothers had organized a new corporation, Eagle Garden Homes, Inc., which issued 30 shares for $1,000 each. Farber subscribed to fifteen shares, Bernard Genchi to ten and Albert to five. The three were the officers, and they plus Celia Farber were the directors. Under the November 18 agreement Eagle Garden bought Farber's 100 shares of Eagle Mount for $160,000; to cover the purchase price it issued a 4% note for that amount, payable November 5, 1955, and it was provided that the Eagle Mount stock would be held by Farber as collateral security until the $160,000 was paid. The agreement and related instruments further provided, among other things, that Eagle Garden would reimburse Farber for the preliminary expenses involved in Eagle Mount's development of the tract; that no dividends could be voted by Eagle Garden until the $160,000 note was paid; that Farber was to see to the payment of the $35,500 note and mortgage under which Eagle Mount was indebted; that the stock ownership in Eagle Mount transferred to Eagle Garden should reflect only Eagle Mount's ownership in ten parcels of land described in the agreement, Eagle Mount being free to transfer any other assets to Farber; that Eagle Garden would construct one-family houses in the price range of $13,-000 or less on the ten parcels; and that if Eagle Garden failed to commence and complete the construction of the houses as contemplated without unnecessary delay, Farber could declare the principal of the note due and payable and, upon Eagle Garden's failure to pay it, could sell the Eagle Mount stock held as collateral free of any claim by Eagle Garden.

Eagle Garden went busily ahead. In January and February, 1953, it let contracts for work and materials needed to construct 81 one-family houses on the ten parcels of Eagle Mount land. As construction on individual lots progressed, it would obtain bank loans upon the presentation of releases freeing the lots from the $35,500 mortgage; out of the money thus advanced by the bank, Eagle Garden would make payments of $2,500 per lot to Farber in curtailment of its $160,000 obligation, or sometimes would make payments directly to Eagle Mount's

mortgagee for releases, being credited for these amounts against the $160,000 debt to Farber. Such direct and indirect payments to Farber aggregated $77,500 in 1953 and $82,500 in 1954. Farber did not report any gain from the sale of the Eagle Mount stock in his 1952 return; he did report the amount by which the $160,000 received exceeded his basis for the stock as a long-term capital gain in 1953 and 1954. By deficiency notice mailed February 12, 1958, the Commissioner asserted that Farber had realized gain on the sale of the stock that was taxable as ordinary income "under the provisions of section 117(m) of the Internal Revenue Code of 1939" in 1952, or, in the alternative, if reporting the transaction on the installment basis under § 44 of the 1939 Code was allowed, that he had realized such gain in 1953 and 1954. After appropriate proceedings the Tax Court, finding § 44 to be applicable, overruled the Commissioner's determination with respect to 1952 but sustained his alternative position as to 1953 and 1954. The taxpayer alone seeks review. We quote in the margin the relevant provisions of § 117 (m).[1]

Petitioner's argument is essentially two-fold. He says, first, that Eagle Mount was not a collapsible corporation within the definition of § 117(m) (2), and, second, that even if it was, collapsible corporation treatment is prohibited by the 70 per cent provision, § 117(m) (3) (B), because, as he asserts, less than 70 per cent of the gain he realized on the sale of the Eagle Mount shares was "attributable to the property * * * constructed" by Eagle Mount.

I.

Taking the various measurements, we think Eagle Mount fits quite snugly into the Congressionally tailored definition of a collapsible corporation, § 117(m) (2).

The first requirement is that the corporation be "formed or availed of principally for the * * * construction * * * of property." We note in passing that if the corporation was so formed or availed of with a view to collapse, it is immaterial that this was not done *principally* with a view to collapse. Weil v. C. I. R., 252 F.2d 805 (2 Cir., 1958). Even limiting our consideration to activities prior to the sale of stock on

1. "(m) *Collapsible corporations.*
 "(i) *Treatment of gain to shareholders.* Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.
 "(2) *Definitions.*
 "(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—
 "(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its share-

holders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and
 "(ii) the realization by such shareholders of gain attributable to such property.
 "(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—
 "(i) it engaged in the manufacture, construction, or production of such property to any extent,
 * * * * *
 "(3) *Limitations on application of subsection.* In the case of gain realized by a shareholder upon his stock in a collapsible corporation—
 * * * * *
 "(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; * * *."

November 18, 1952, and without regard to the possible significance of what was later done on Eagle Mount's property pursuant to the sale contract, we have no doubt that Eagle Mount was "availed of principally for * * * construction", in the light of the provision of § 117(m) (2) (B) that "a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—(i) it engaged in the manufacture, construction, or production of such property to any extent." We are not obliged to rely wholly on the filing of applications for permits and loan guarantees and the payment of required filing fees, although we do not say that, in this age when real estate development is so dependent upon government licenses and financial aid, the filing of papers to procure these could not, as much as the digging of a cellar excavation, constitute "construction * * * to any extent" under § 117(m). See Sterner, 32 T.C. 1144, 1149 (1959); Rev.Rul. 56–137, 1956–1 Cum.Bull. p. 178. Here, in addition, Eagle Mount had made substantial payments for utility connections and water materials. Even though these had not yet been affixed to the land, the combination of all the elements here involved constituted construction "to any extent" in the broad sense in which the statute uses the term, especially since the legislative history shows an intent to equate construction with anything that adds value to the property.[2]

 The second requirement of the definition is that there should have been

"a view to—(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise) * * * prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and (ii) the realization by such shareholders of gain attributable to such property." It is plain that petitioner had such a "view". He made the sale before the realization of any "of the net income to be derived from such property", and there is no force in his contention that "the words 'substantial part of the net income to be derived from such property' mean income already created (through construction by Eagle Mount in this case) before sale or liquidation—not that which remains to be created or earned afterwards", an interpretation inconsistent both with the language and the announced Congressional purpose. Cf. Spangler v. C. I. R., 278 F.2d 665, 671 (4 Cir.), cert. denied, 364 U.S. 825, 81 S.Ct. 63, 5 L.Ed.2d 54 (1960); Short v. C. I. R., 302 F.2d 120, 124 (4 Cir., 1962). It is equally plain that petitioner had the "view" at the time required by the Regulations, which say, Reg. § 39.-117(m)–1(b) (4), that "a corporation is formed or availed of with a view to the action described in section 117(m) (2) (A) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section." [3] For, as we have held, Eagle Mount had been "availed of" principally for "construction" prior to

---

**2.** The committee reports state that under § 117(m) (2) (B), a corporation "need not have originated the manufacture, construction or production," nor need the manufacture, construction or production be completed by it. It will nonetheless "be deemed to have manufactured, constructed or produced property in that its shareholders may realize gain with respect to the additional value added to the property by the manufacture, construction or production to the extent that it was carried out." 1950–2 Cum.Bull. at 450, 547.

**3.** The Regulations continue:
"Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange, or distribution is attributable to circumstances present at the

the sale. There is thus no need to concern ourselves with the special issue relating to the necessary time for the "view" that was discussed in Burge v. C. I. R., 253 F.2d 765, 769, 74 A.L.R. 2d 664 (4 Cir., 1958); Glickman v. C. I. R., 256 F.2d 108, 111 (2 Cir., 1958); and Sidney v. C. I. R., 273 F.2d 928, 931 (2 Cir., 1960), but is now ruled more strictly in Jacobson v. C. I. R., 281 F.2d 703, 705–706 (3 Cir., 1960), and Braunstein v. C. I. R., 305 F.2d 949, 951, (2 Cir.), cert. granted, 83 S.Ct. 306 (1962).

## II.

The 70 per cent clause, § 117(m) (3) (B), set forth in fn. 1, has the protean quality that characterizes so many provisions of the collapsible corporation amendment. Compare C. I. R. v. Kelley, 293 F.2d 904 (5 Cir., 1961), and the law review comments cited in Judge Wisdom's opinion. Clearly it renders the amendment inapplicable when 30 per cent or more of the gain is attributable to sources unrelated to the "collapsible property"—as, for example, on the liquidation of a real estate corporation which is distributing a new office building constructed as described in § 117(m) (2) and not yet rented, along with a surplus, accumulated over the years from ordinary rental and management income on other properties, which represents 30 per cent or more of the total gain recognized to the shareholders on the liquidation. Cf. Reg. § 1.341–4(c) (4) (1962). At this rather early point clarity ends, and the interpretive road forks. Under one

interpretation, which has apparently been espoused by the Commissioner, see 3B Mertens, Federal Income Taxation, at 252–53 n. 3 (1958), the sole test for inclusion in the 70 per cent portion is the identity of the property to which the gain in question "is attributable". If this is property that has been "manufactured, constructed, produced, or purchased" so as to meet the definition of a collapsible corporation, then all the gain "attributable to" it qualifies for the 70 per cent on this view, irrespective of its cause, as for example, when the gain to the stockholder represented by the fair market value of a newly constructed office building is shown to be primarily due to the unexpected rezoning of adjacent land and erection of a shopping center thereon. The taxpayer, reading the same words with a different intonation, contends that gain qualifies for the 70 per cent only if attributable to the construction itself, and that such construction must, in addition, be performed by the collapsible corporation. The Regulations, which provide, Reg. § 39.117(m)–1(c) (3) (ii) (1954), that "the gain attributable to the property referred to in section 117(m) (2) (A) is the excess of the recognized gain of the shareholder during the taxable year upon his stock in the collapsible corporation over the recognized gain which the shareholder would have if the property had not been * * * constructed," cut somewhat, although perhaps not decisively, against the taxpayer.[4] The legislative history tells us that the purpose of the 70 per cent clause was

---

time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of."

It is common ground that the term "purchase" and "purchased" as used in the statute and regulations are not applicable to the instant case, since they refer to "the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A)."

4. The Regulations provide in full:
Reg. § 39.117(m)–1(c) (3).
"(3) SEVENTY-PERCENT RULE. (i) This section shall apply to the gain rec-

ognized during a taxable year upon the stock in a collapsible corporation only if more than 70 percent of such gain is attributable to the property referred to in section 117(m) (2) (A).

If more than 70 percent of such gain is so attributable, then all of such gain is subject to this section, and, if 70 percent or less of such gain is so attributable, then none of such gain is subject to this section.

"(ii) For the purpose of this limitation, the gain attributable to the property referred to in section 117(m) (2) (A) is the excess of the recognized gain of the shareholder during the taxable year upon

"to insure that the application of the subsection will be limited to those corporations where the relationship between the gain realized and the property manufactured, constructed, or produced is substantial," H.R.Rep. No. 2319, Sen.Rep. No. 2375, 81st Cong., 2d Sess. (1950), in 1950–2 Cum.Bull. at 451, 548. In Braunstein v. C. I. R., 305 F.2d 949, 956 (2 Cir.), cert. granted, 83 S.Ct. 306 (1962), we found it unnecessary to choose between the two possible readings.

■ However the 70 per cent clause be construed, Farber had the burden, under Tax Court Rule 32, of bringing himself within it.[5] He made no attempt to do this by presenting evidence of an increase in land value unrelated to the construction, as other taxpayers jousting with the clause have sought to do. See Glickman v. C. I. R., 256 F.2d 108, 111 (2 Cir., 1958); Payne v. C. I. R., 268 F.2d 617, 621 (5 Cir., 1959); August, 30 T.C. 969, 983–987 (1958), aff'd, 267 F.2d 829 (3 Cir., 1959); Gerber, 32 T.C. 1199 (1959); Mintz v. C. I. R., 284 F.2d 554, 559–560 (2 Cir., 1960); Short v. C. I. R., 302 F.2d 120, 124–125 (4 Cir., 1962). Indeed, Farber explicitly disavows any contention that the value of Eagle Mount's land increased between the time it was purchased and the time he sold his stock. His argument is rather that at least 30 per cent of the gain—indeed very much more—must be attributable to the construction activities of Eagle Garden rather than to the relatively insignificant ones of Eagle Mount before the sale, so that the requisite 70 per cent was not attributable to construction by the collapsible corporation within his interpretation of the clause.

■ The 70 per cent clause must be read in the general framework in which § 117(m) was to operate. Congress surely contemplated that sale, exchange or distribution could occur while construction or production by the corporation was incomplete—indeed, this was one of the situations at which the amendment was principally aimed. We cannot believe Congress intended by the 70 per cent clause to require that in every such case there must be an allocation of "gain" on a before and after basis to determine whether the subsection was to apply. If, at an early stage, stockholders sell the stock of a corporation constructing an office building already leased on a profitable basis, it is sheer guesswork how much "gain" is attributable to the concept, the choice of site and architect, the plan and its approval by local authorities, the financing scheme, and the building already done, and how much to what remains to be done before a penny of rent will be received. The price does not represent a scientific appraisal of these

his stock in the collapsible corporation over the recognized gain which the shareholder would have if the property had not been manufactured, constructed, produced, or purchased. In the case of gain on a distribution in partial liquidation or a distribution described in section 115(d), the gain attributable to the property shall not be less than an amount which bears the same ratio to the gain on such distribution as the gain which would be attributable to the property if there had been a complete liquidation at the time of such distribution bears to the total gain which would have resulted from such complete liquidation.

"(iii) Gain may be attributable to the property referred to in section 117(m) (2) (A) even though such gain is represented by an appreciation in the value of property other than that manufactured, constructed, produced, or purchased. Where, for example, a corporation owns a tract of land and the development of one-half of the tract increases the value of the other half, the gain attributable to the developed half of the tract includes the increase in the value of the other half."

5. The statement in Wilson, 25 T.C. 1058, 1066 (1956), that the Commissioner had some burden of negating the possibility that "more than 30 percent of the gain may have been attributable to factors totally unrelated to the construction", and a similar statement in W. H. Weaver, 25 T.C. 1067, 1085–1086 (1956), apparently rested on the fact that the Commissioner had not relied on § 117(m) until the cases reached the Tax Court. Apart from that, the burden is clearly on the taxpayer. See, e. g., Glickman v. C. I. R., 256 F.2d 108, 111 (2 Cir., 1958).

elements; rather it is the resultant of the seller's wish to make the buyer pay not only the cost of what has been done but the largest possible proportion of the value to be ultimately represented by the completed project, and the buyer's desire to pay the least. That is what happened here. The negotiations that culminated in the sale of Farber's Eagle Mount stock to Eagle Garden were, as he testified, not simply in respect of the land and the steps already taken by Eagle Mount with respect to it, but rather of "the development" or "the deal"—the Genchi brothers saw sufficient potential in "the deal" to be willing to let their 50%-owned corporation, Eagle Garden, incur a $160,000 obligation to Farber which came ahead of their stock in Eagle Garden and for which the Eagle Mount stock was pledged as collateral. A determination how much of petitioner's gain was in respect of what had been done by Eagle Mount prior to November 18, 1952, and how much was in respect of what Eagle Garden was committed to do on Eagle Mount's property thereafter, would be an attempt to separate the inseparable. Although such feats may sometimes be required in tax law, we do not think Congress meant the 70 per cent clause to impose what would be so regular a burden on the Commissioner and the courts in applying § 117 (m) to situations otherwise falling under it. See Abbott v. C. I. R., 258 F.2d 537 (3 Cir., 1958), affirming 28 T.C. 795 (1957), and Sterner, 32 T.C. 1144 (1959). Neither do we see any force in Farber's contention that, whatever may be the general rule, he is entitled to special consideration because, as a practical matter, the $160,000 note would be paid only if Eagle Garden performed the further construction it was required to perform. If there had been a default, Farber would not have been taxed save on the profit from instalment payments already made. He has not sustained the burden of show-

ing that the $160,000 note was not worth its face value, cf. United States v. Davis, 370 U.S. 65, 71–74, 82 S.Ct. 1190, 8 L.Ed. 2d 335 (1962); indeed, on the instalment basis which he elected and has been allowed to use, that question became academic. To whatever extent § 117(m) (3) (B) may go beyond the situation where unrelated property accounts for 30 per cent of the gain, an issue we find it unnecessary to decide, it does not go far enough to help petitioner.[6]

Affirmed.

6. In view of this holding, we need not consider—even if we could do so, in view of the fact that the points were not raised below—the Commissioner's alternative arguments that the payments on the note were taxable to Farber at ordinary-income rates either as distributions of the earnings of Eagle Garden or on the theory that Eagle *Garden* was a collapsible corporation.