JOHN P. REAVER AND OPAL P. REAVER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93589.   Filed April 13, 1964.

*Hugh R. Dowling* and *John W. Mooers*, for the petitioners.
*Louis J. DeReuil*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1958 in the amount of $40,199.98, and in additions to tax under sections 6653 (a) and 6654(a), I.R.C. 1954,[1] in the respective amounts of $2,010 and $31.23.

The primary issue for decision is whether petitioners are entitled to return gain and pay tax on their gain from the sale of a 35-acre tract of land in 1958 on the installment method. If it is held that petitioners are not to employ the installment method of returning taxable gain from the sale, we must determine whether two notes received by petitioners in 1958 as consideration for the sale of the property had an ascertainable fair market value; and if so, what that value was in 1958.

Secondary issues for decision are whether petitioners are liable for the additions to tax under sections 6653(a) and 6654(a) of the Code. Other issues raised in the pleadings were conceded by petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. Petitioners, John P. Reaver and Opal P. Reaver (hereinafter respectively referred to as John and Opal), were husband and wife who resided in Panama City, Fla., in 1958. They filed a joint Federal income tax return for the year 1958 with the district director of internal revenue, Jacksonville, Fla., on October 22, 1959. They filed an amended joint Federal income tax return for the year 1958 on August 11, 1961. They did not file a declaration of estimated tax for the year 1958.

In 1958 John operated an airport in Panama City, Fla. The business was conducted on a tract of land on 11th Street in Panama City. The property covered approximately 35 acres of land. Located on the property was a hangar for aircraft and a one-story concrete building near the hangar which served as a shop for the repair of aircraft and as an office for the business. Also on the property was a two-bedroom residence where John and Opal lived.

Opal assisted John in the operation of the airport. She was a mechanical engineering draftsman, a licensed pilot, and a licensed airplane mechanic. She repaired aircraft and maintained the books and records of the business. In their business, John and Opal rebuilt

---

[1] All statutory references are to the 1954 Code unless otherwise noted.

damaged aircraft, arranged for charter flights, and offered flight instruction. Their airport was known as a fixed base operation, and they could offer night flying instructions to students. They also had aircraft for rent.

In January 1958 John's health deteriorated and he was unable to work at the airport for a full day. A physical examination in the early part of 1958 revealed that he had a serious heart condition and he was advised by a local physician to contact a heart specialist in Philadelphia, Pa. In May 1958 John went to Philadelphia for examinations. He was told that his heart condition was serious and that it required surgery. He was advised to stay in Philadelphia for observation, but John and Opal had to return to Panama City to arrange their affairs before John could spend the necessary time in Philadelphia for preliminary examinations and for the operation for his heart condition. In late June 1958 John returned to Philadelphia for the preliminary examinations and for observation to determine if he could undergo the operation. On July 24, 1958, the operation was performed and John was permitted to return to Panama City in August 1958. However, he was told he could not engage in work until early 1959. Whether the operation had been a success was not known in August 1958 when John left Philadelphia. During John's hospitalization in Philadelphia, Opal stayed with him in Philadelphia for approximately 3 weeks during the critical stage of his illness, but she thereafter had to return to Panama City to take care of their child and the airport business.

In 1958 members of the Central Baptist Church, Inc., Panama City (hereafter called Central Baptist), became interested in having the church purchase the property used by petitioners for their airport. They approached John with their idea of purchasing the property and after first refusing, John then agreed to sell the property to the church. Central Baptist was formed April 28, 1958, as a successor to the Oakland Terrace Baptist Church, which was formed in May 1957. In April 1958 the membership of Central Baptist was approximately 75. On June 20, 1958, John and Opal and Central Baptist executed a contract of sale for petitioners' 35-acre tract in Panama City for a total purchase price of $182,600. Central Baptist paid petitioner the sum of $250 in cash and agreed to pay the further sum of $750 in cash within 20 days after execution of the contract of sale. Central Baptist was to execute promissory notes in the amount of $181,600 for the balance of the purchase price. On June 25, 1958, John and Opal executed a deed for their 35-acre tract and delivered the deed to Central Baptist. On the same date Central Baptist executed two promissory notes payable to John and Opal. The first note was in the principal sum of $13,400 and provided that Central Baptist was to pay this principal sum in 24 monthly installments, the first 5

payments being in the amount of $400 each, and the remaining 19 monthly payments in the amount of $600 each. The note was non-interest bearing. This note contained a "Guaranty" stating that nine individuals jointly and severally promised to pay the note which was endorsed by the nine individuals. The second note was in the principal sum of $168,200 which was payable in annual installments of $15,800 on September 1, 1960, and thereafter in eight annual installments of $19,050 each. The note was noninterest bearing and was not endorsed by any individuals.

In 1958 Central Baptist paid to petitioners, in consideration for the property, $1,000 in cash under the contract of sale and the total amount of $1,600 in payments on the first installment note.

At some time in 1958, prior to concluding the sale of the property to Central Baptist, John discussed the sale of the property with a certified public accountant in Panama City. The accountant explained to him generally the installment method of accounting for gain on a deferred payment sale but suggested to John that if a deferred payment sale was completed in 1958 that John come back to see him before his 1958 tax return was due to be filed and he would prepare his return for him.

Central Baptist began to move into the property shortly after June 25, 1958, but because of John's illness and his absence from Panama City, Opal could not move the business from the property entirely and Central Baptist occupied only one-half of the hangar building where they began conducting church services. Petitioners' airport business was conducted in the other half of the hangar. Opal was in charge of the business and of the move from the property.

In 1959 Opal undertook preparation of petitioners' 1958 income tax return, but she was delayed in completing the return because some of the records of the business had been moved to a warehouse during her absence when Central Baptist began to occupy the hangar. Opal filed petitioners' joint income tax return for 1958 on October 22, 1959. She did not request an extension of time within which to file the return for 1958 which was due April 15, 1959, but she wrote a letter of transmittal to the district director of internal revenue, Jacksonville, Fla., explaining her reasons for filing their return out of time. Petitioners' original return for 1958 was accepted by respondent as having been filed out of time for reasonable cause.

Opal's failure to prepare, and petitioners' failure to file, a timely return for 1958 was due to reasonable cause and was not due to willful neglect.

In preparing petitioners' return Opal used records which had been maintained for the airport business. She used one book which she maintained which consisted of sheets of notebook paper tied together with twine, with one sheet for each month of the year 1958, upon

which were recorded cash receipts and disbursements, the sources of receipts or payees of payments, and generally what a payment or a receipt was for. The cash downpayment and the monthly payments received in 1958 from Central Baptist were entered in this book simply as cash receipts from Central Baptist. Opal had had no education or training in bookkeeping and was not familiar with a double entry set of books. In preparing petitioners' return for 1958 she summarized the amount of cash received as shown in her record book, including the $2,600 received from Central Baptist, and entered this amount as gross receipts of the business on the 1958 income tax return. She made minor errors in addition in adding the monthly summaries in her record book.

In 1960 an internal revenue agent examined petitioners' returns for 1958 and 1959. This examination was completed on or about November 3, 1960. Working from petitioners' records, including the record book from which Opal had prepared the 1958 return, the examining officer determined that Opal had overstated gross receipts of the business in the amount of $3,791.51, the principal adjustment being the elimination of the $2,600 received from Central Baptist on the sale of the 35-acre tract from gross receipts of the airport business. The agent also corrected other errors made by Opal and made other adjustments in arriving at his corrected taxable income, some of which increased income and some of which decreased income. He also determined that petitioners realized a gain from the sale of a capital asset, the 35-acre tract, in 1958 in the amount of $79,499.37.

After Opal and John discussed their 1958 and 1959 returns with the examining officer, they contacted the certified public accountant with whom John had talked in early 1958. The accountant prepared an amended return for petitioners for each of the years 1958 and 1959. The amended return for 1958 was the same as the original return except that the sale of the 35-acre tract to Central Baptist was specifically reported as a capital transaction, the gross profit on the sale was computed, and the gain was accounted for on the installment method.

In his notice of deficiency for the year 1958 respondent determined that petitioners realized gain on the sale of the 35-acre tract in the amount of $79,499.13; that a deduction for taxes in the amount of $452.84 is not allowable; that because of adjustments to petitioners' reported adjusted gross income, medical expenses in the amount of $2,298.54 are not allowable; and that petitioners realized income from their airport business in the amount of $704.04 less than that reported by them on their 1958 return.

There is no dispute between the parties with respect to the amount of petitioners' gain on the sale of the 35-acre tract if the sales price stated in the contract is paid in full.

No part of the deficiency herein is due to negligence or intentional disregard of rules and regulations pertaining to the determination of petitioners' income tax liability. Petitioners' failure to report the sale of the 35-acre tract as a capital transaction and their failure to elect to report the income therefrom, and set forth the computation of gross profit thereon, on the installment method was not due to negligence or intentional disregard of rules and regulations.

OPINION

The primary issue for decision is whether petitioners are entitled to report their gain on the sale of a 35-acre tract of real estate in 1958 on the installment basis under section 453(b) of the 1954 Code. The sales price was $182,600, of which $1,000 cash was paid as down-payment with the balance of the purchase price being evidenced by two notes payable over a number of years. During the year 1958, petitioners received the $1,000 downpayment and four monthly payments of $400 each, or a total of $2,600, on the purchase price. Petitioners entered these payments as business income on their books and included the $2,600 in the gross receipts from their business reported on their 1958 income tax return, which was not filed until October 1959. The sale was not specifically mentioned on the return and no basis in the property was claimed as a deduction; no computation of profit on the sale was reflected on the original return for 1958. After a revenue agent had audited petitioners' return for 1958, on the advice of an accountant petitioners filed an amended return for 1958 in August 1961, reporting the gain on the sale as long-term capital gain, setting forth the computations necessary to compute the gain, and electing to report the gain on the installment basis.

Based on all the evidence, we have found as a fact that petitioners' failure to file their original return for 1958 on time was due to reasonable cause, which respondent does not dispute; and also that petitioners' failure to report the transaction and the amounts received therefrom as the sale of a capital asset on their original return for 1958 was not due to negligence or intentional disregard of rules and regulations.

Section 453(b) of the 1954 Code, which is the same for our purposes as section 44(b) of the 1939 Code, provides simply that income from a sale or other disposition of real property may, under regulations prescribed by the Secretary, be returned on the installment basis provided in section 453(a).

The controlling regulation is sec. 1.453-8(b)(1), Income Tax Regs., which was promulgated late in 1958 (T.D. 6314, 1958-2 C.B. 160, filed Sept. 17, 1958) but was made applicable to taxable years ending after December 17, 1958 (sec. 1.453-10(b)). It provides as follows:

(b) *Sales of real property and casual sales of personal property.* (1) A taxpayer who sells or otherwise disposes of real property, or who makes a casual sale or other casual disposition of personal property, and who elects to report the income therefrom on the installment method must set forth in his income tax return (or in a statement attached thereto) for the year of the sale or other disposition the computation of the gross profit on the sale or other disposition under the installment method. In any taxable year in which the taxpayer receives payments attributable to such sale or other disposition, he must also show in his income tax return the computation of the amount of income which is being reported in that year on such sale or other disposition.

Respondent's primary argument in this case is that petitioners, having failed to elect to report their profit on the sale on the installment basis on a *timely filed return* for the year 1958, forfeited their right to elect the installment basis, so the entire profit is taxable in 1958, the year of sale.[2] See Rev. Rul. 93, 1953–1 C.B. 82. Secondarily, respondent contends that petitioners could not obtain the benefits of the installment method of reporting by filing an amended return for 1958 which did meet the requirements of the regulations.

Respondent's primary argument finds support in some of the language used in earlier opinions of this Court, see *Sarah Briarly*, 29 B.T.A. 256 (1933); *W. T. Thrift, Sr.*, 15 T.C. 366 (1950); *Cedar Valley Distillery, Inc.*, 16 T.C. 870 (1951); *W. A. Ireland*, 32 T.C. 994 (1959). However, in most of these cases there had been either a complete failure to report any income from the transaction in the original return for the year of sale and/or no amended return had been filed, or an affirmative election had been made in the return filed to report the sale on some basis inconsistent with the installment method. In more recent cases, however, this Court has not always adhered to the strict rule enunciated in Rev. Rul. 93, *supra.* See *John F. Bayley*, 35 T.C. 288 (1960); *Jack Farber*, 36 T.C. 1142 (1961), affd. 312 F. 2d 729 (1963) without mention of this issue, certiorari denied 374 U.S. 828 (1963); *Nathan C. Spivey*, 40 T.C. 1051 (1963). Compare, however, *Marion C' de Baca*, 38 T.C. 609 (1962), revd. 326 F. 2d 189 (C.A. 5, 1964).

The Courts of Appeals which dealt with this problem under the 1939 Code and the regulations promulgated thereunder, Regs. 118, sec. 39.44–3, which were effective until December 17, 1958, also generally refused to apply the strict rule relied on by respondent. So far as we can determine only two circuit courts were squarely faced with the issue under the prior regulations, and in each instance both of them declined to apply the strict rule. See *United States* v. *Eversman*, 133 F. 2d 261 (1943), and *Scales* v. *Commissioner*, 211 F. 2d 133 (1954), reversing 18 T.C. 1263 (1952), both decided by the Court of Appeals for the Sixth Circuit; and *Hornberger* v. *Commissioner*, 289 F. 2d

---

[2] There is no question that the sale otherwise met the requirements for installment reporting contained in sec. 453 of the 1954 Code.

602 (1961), reversing a Memorandum Opinion of this Court, and *Baca* v. *Commissioner*, 326 F. 2d 189 (1964), reversing 38 T.C. 609 (1962), both decided by the Court of Appeals for the Fifth Circuit. The Court of Appeals for the Ninth Circuit did affirm a decision of this Court, *S. Nicholas Jacobs*, 21 T.C. 165 (1953), holding that the taxpayer was not entitled to use the installment method, but both this Court and the Court of Appeals decided the case on the rule laid down by the Supreme Court in *Pacific National Co.* v. *Welch*, 304 U.S. 191 (1938), that once a taxpayer elects to report a sale on some method other than the installment method he is bound by that election. See *Jacobs* v. *Commissioner*, 224 F. 2d 412 (1955). This latter rule is clearly established, and a decision based on that rule is not authority for the proposition that the right to elect the installment method is always forfeited unless the election is affirmatively made in a timely return for the year of sale.

Most of the above cases which have not applied the forfeiture rule, all of which were decided under the prior regulations, were decided on the basis that neither the statute nor the regulations specifically required that an election to use the installment method be made in a timely return for the year of sale or be forfeited, and that, Congress having provided other penalties for failure to report income and for failure to file returns on time, it was not intended that the privilege of installment reporting be denied a taxpayer for similar negligent or nonnegligent omissions.

A review of the legislative history of the installment reporting provisions, which we will not take the time to recite herein, indicates that there is justification for the above-expressed view. Section 453 of the 1954 Code has its origin in section 212(d) of the Revenue Act of 1926. The report of the Senate Finance Committee which proposed the adoption of a statutory provision clearly authorizing use of the installment method, states the reason for the proposal as follows:

> The application of the installment basis as provided in the committee amendment should eliminate necessity for appraisals of the obligations of the purchaser in deferred-payment sales * * * save in cases where, because of a large initial payment * * * the property sold and serving as security for the unpaid balance has a value adequate to give the obligations a market value. [S. Rept. No. 52, 69th Cong., 1st Sess., p. 19 (1926), 1939–1 C.B. (Part 2) 332, 347.]

Section 212(d) was made retroactive and it appears that many taxpayers who were dealers in personal property filed amended returns for prior years reporting sales on the installment basis, which caused considerable administrative confusion. See *Willcuts* v. *Gradwohl*, 58 F. 2d 587 (C.A. 8, 1932). But it is sufficient to note that we find nothing in the legislative history of this provision to indicate that it was intended that a taxpayer who was not a dealer could not elect to report the gain on the sale of a capital asset on the installment basis

by an amended return. We find instead a congressional intention to permit use of the installment method, not merely as a benefit to the taxpayer, but principally to avoid the difficult problem of valuation of deferred obligations received by the seller.[3]

Neither the statute nor the regulations specifically require that the taxpayer must elect to report a casual sale of real estate on the installment method in a timely filed return. As previously noted, the installment sale provisions in both the 1939 Code and section 453(b) of the 1954 Code simply provide that, if the limitations with respect to the payments received during the year of sale are met, the profit on a sale of real property may be returned on the installment basis, under regulations prescribed by the Secretary. The regulations under the 1939 Code, Regs. 118, sec. 39.44-3, provided only that a "vendor may return as income from such transactions in any taxable year that proportion of the installment payments actually received" without mention of the time or method of making an election.

The regulation promulgated in 1958 under section 453 of the 1954 Code, sec. 1.453-8(b)(1) heretofore quoted, does not provide that the election must be made on an original return timely filed, but only that one who elects to report a sale on the installment method must set forth in his return for the year of sale the computation of the gross profit on the sale. This regulation has been found to be reasonable and valid by the Court of Appeals for the Tenth Circuit in *Ackerman* v. *United States*, 318 F. 2d 402 (1963), wherein the court denied the taxpayer the privilege of reporting on the installment method. There, however, the taxpayer had apparently never reported the sale on a return for the year of sale, because no payments were received in that year, and the court held that the taxpayer had forfeited his right to elect the installment method by not complying with what it considered to be the reasonable reporting requirements of the regulation. In the only other case we have found involving a year to which the new regulations were applicable, *Peter Mamula*, 41 T.C. 572 (1964), this Court denied the taxpayer the right to report on the installment method, but this was based on the rule of *Pacific National Co.* v. *Welch, supra*, that the taxpayer was bound by his previous election to report on the deferred payment basis.

The Commissioner has been given rather broad rule-making authority by section 453[4] and it would seem that if he considered it to be a reasonable and valid requirement under the statute that an affirmative election to use the installment method be made in an original and timely filed return for the year of sale, he would so provide in his regulation. It is interesting to note that paragraph (a) of this same

---

[3] As hereinafter noted, the reason for eliminating the necessity of appraising the deferred obligations of the purchaser is admirably illustrated in this case.

[4] See, however, fn. 2 of the Court of Appeals' opinion in *Baca* v. *Commissioner*, 326 F. 2d 189 (C.A. 5, 1964), reversing 38 T.C. 609 (1962).

section of the regulations, sec. 1.453–8(a), relating to dealers in personal property, was amended by T.D. 6682, 1963–2 C.B. 197, filed Oct. 15, 1963, to specifically provide that an election by a dealer in personal property to adopt or change to the installment method "must be made on an income tax return for the taxable year of the election, filed on or before the time specified (including extensions thereof) for filing such return." There may be more reason to require a dealer in personal property to make the election in a timely filed return than for taxpayers making casual sales of property, but this indicates that the omission of a similar requirement in the part of the regulation here involved could hardly be due to oversight.

In *John F. Bayley*, *supra*, taxpayers reported a sale of their residence on their original return but did not report the gain on the sale, claiming nonrecognition of the gain under section 1034, I.R.C. 1954. When it was found that the gain did not qualify for nonrecognition we permitted the taxpayers to elect, by amended petition filed in this Court, to report the gain on the installment method. In the opinion we said, "An election normally implies a choice between two or more alternatives" and found that when the taxpayers claimed the benefit of the nonrecognition provisions they were not then electing between reporting the gain in its entirety on the one hand and reporting only a portion of the gain on the installment method on the other hand. Similarly here, we do not think the taxpayers were making an election between reporting the gain on their sale all in one year and reporting it on the installment method when they reported the entire amount they received during the year of sale as business income on their return for 1958. We are convinced that Opal, who prepared the return, either did not realize that the amounts received from Central Baptist in 1958 were being included in business income or did not know that the payments received should be reported as proceeds from the sale of a capital assets, and even more so that she knew nothing about the privilege of reporting on the installment method.[5] By reporting the proceeds as ordinary business receipts, petitioners made no conscious election to report the transaction other than on the installment method so as to prevent them from electing the installment method under the rule of *Pacific National Co.* v. *Welch*, *supra*. Hence, their reporting of the gross receipts from Central Baptist as business income on their original return for 1958 and their failure to furnish the computations required by the current regulations on their original return was not fatal.

Generally, an election is to be exercised when the occasion for doing so arises. See *Jack Farber*, *supra*. Here, petitioners made an honest mistake and rectified it at the first opportunity. We discern no reason

---

[5] Opal had never discussed this with an accountant and John did not tell her of his conversation with the accountant early in 1958.

why petitioners' amended return for the year of sale, filed within the period for determining a deficiency for 1958 or for any year affected, should not be deemed to be compliance with the requirements of the regulations. Petitioners have never adopted any position inconsistent with that reflected in the amended return; they have never represented that they were using any other method to account for their gain on the sale; the entire receipts were included in income; all the information required by the regulations was supplied in the amended return; and respondent at no time could have been misled to his disadvantage.

On the authority of our recent decisions in *John F. Bayley*, *Jack Farber*, and *Nathan C. Spivey*, all *supra*, and having due regard to the views expressed by the Courts of Appeals for the Fifth and Sixth Circuits, we hold that, under the circumstances here present, these petitioners are entitled to report their gain on the sale on the installment method.

Our conclusion above makes it unnecessary for us to consider petitioners' alternative contention that the notes of the church received for the unpaid balance of the purchase price had no commercial negotiability and therefore are not to be considered as part of the amount realized, relying on *Nina J. Ennis*, 17 T.C. 465 (1951). Suffice it to say that the evidence introduced in support of this theory pertaining to the value and negotiability of these notes in the face amount of $181,600 given by a newly organized church with few members and little financial backing emphasizes the value of the installment-reporting provisions in determining the actual taxable income of a casual seller of property on a year-to-year basis, and convinces us that the technicalities of reporting are not as important as the availability of the installment method where the taxpayer has made no inconsistent election and the Government does not stand to lose by the taxpayer's mistake.

The second issue is whether petitioners are liable for an addition to tax for negligence under section 6653(a), I.R.C. 1954, which provides that if any part of any underpayment of tax is due to negligence or intentional disregard of rules and regulations (but without intent to defraud) there shall be added to the tax an amount equal to 5 percent of the underpayment. The revenue agent determined that petitioners' books and records did not properly reflect income, which necessitated the adjustments indicated in his report, some of which were conceded by petitioners.

It is doubtful, in view of our conclusion on the principal issue, that there will be much, if any, underpayment of tax for the year 1958. In any event the evidence indicates that petitioners' books and records were of the single entry type kept by many small businesses, and the revenue agent was apparently able to make his pro-

posed adjustments in petitioners' income by working from those books and records. There is no indication that income was omitted from the books or that expenditures were duplicated. The evidence indicates that the entries in the books and records did reflect the correct income if properly applied. Respondent offered no convincing explanation as to why the books and records were not adequate. We have found as a fact that no part of the underpayment of tax, if any, was due to negligence or intentional disregard of rules and regulations. It follows that the addition to tax under section 6653(a) is not applicable.

The final issue for decision is whether petitioners are liable for an addition to tax for failure to file a declaration of estimated tax for the year 1958. The amount involved is small and petitioners offered no evidence nor arguments with respect to this issue. We held in *Estate of Barney Ruben*, 33 T.C. 1071 (1960), that the addition to tax under section 6654(a), I.R.C. 1954, is mandatory unless one of the exceptions in subsection (d) applies. In the absence of evidence that any of the exceptions applies, we hold for respondent on this issue.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

WITHEY, *J.*, concurs in the result.

OPPER, *J.*, dissents.