George E. Freitas and Flora C. Freitas, et al. [1] v. Commissioner. Freitas v. Commissioner
Docket Nos. 2519-62, 2703-62, 4829-62, 4830-62, 4799-63. T.C. Memo. 1966-105.
United States Tax Court
T.C. Memo 1966-105; 1966 Tax Ct. Memo LEXIS 177; 25 T.C.M. (CCH) 545; T.C.M. (RIA) 66105; May 24, 1966
*177 Corporation formed for the purpose of building and operating an apartment in Hawaii, held, not a collapsible corporation ( Sec. 341, I.R.C. 1954) where the plan to sell the stock of the corporate owner was not conceived until after the apartment building was completed. Gain on the sale of the stock of corporate owner, held, taxable as capital gain. Held, further, installment method of reporting gain on the sale of the stock not now available to stockholder, who did not report the transaction in his return for the year of the sale, electing to report it in later years on the deferred payment method. Held, further, that the contingent liability of the stockholders for payments in future years on a mortgage note on the property was too remote and indefinite to be taken into account in computing their gain on the sale of the stock. Milton Cades and Richard L. Griffith, First National Bank Bldg., P.O. Box 939, Honolulu, Hawaii, for the petitioners. Wesley A. Dierberger, for the respondent. TIETJENS
Memorandum Findings of Fact and *179 Opinion TIETJENS, Judge: These consolidated proceedings involve income tax deficiencies and addition to tax as follows: Taxable
Addition
Docket
Year
to tax
No.
Petitioner
Ended
Deficiency
Sec. 6653(a)
2519-62
George E. Freitas and Flora C. Freitas
12-31-57
$157,382.74
12-31-58
148,919.87
2703-62
Herbert W. Haugland and Dorothy A. Haugland
12-31-57
158,485.83
12-31-58
143,627.48
4829-62
John I. Weston and Gwendolyn T. Weston
7-31-56
714.21
7-31-57
123,019.26
7-31-58
108,430.89
7-31-59
141.00
4830-62
Robert B. Hoitt and Grace P. Hoitt
12-31-55
$ 2,505.48
12-31-57
112,187.74
12-31-58
115,391.08
12-31-59
798.03
$39.90
4799-63
Reed & Martin, Inc., an Alaskan Corporation
11-30-56
3,585.76
11-30-58
188,804.81
11-30-59
4,569.29
11-30-61
2,981.32
Some of the issues raised in the pleadings have been settled by a stipulation or have been conceded by the parties in their briefs. Many of the facts also have been stipulated. The stipulation and concessions will be given effect under a Rule 50 computation. The questions remaining for our determination are: *180 1. Whether petitioners are entitled to report the gain on the sale of stock representing their interests in an apartment building in Honolulu, Hawaii, as long-term capital gain rather than ordinary income; 2. Whether petitioner Reed & Martin, Inc., is entitled to report its gain on the sale of stock under the recovery of cost, or deferred payment method; and, if not, whether it may now elect to report it on the installment basis; and 3. Whether petitioners John I. and Gwendolyn T. Weston are entitled to include in the cost of their stock their pro rata share of the stockholders' contingent liability on a mortgage on the properties of the corporation whose stock they sold. Because of concessions made by the parties in their reply briefs many of the facts requested are not now pertinent to the issues to be determined. Findings of Fact The stipulated facts are incorporated herein by reference. The above-named wives are petitioners in these proceedings only because they filed joint returns with their husbands. As hereinafter used, the term petitioner, or petitioners, will refer to the husbands or to the corporate petitioner Reed & Martin, Inc. Petitioner George E. Freitas *181 is a resident of Honolulu, Hawaii, and his returns were filed with the district director of internal revenue at Honolulu. Petitioner Herbert W. Haugland is a resident of Seattle, Washington; petitioners John I. Weston and Robert B. Hoitt are residents of Fairbanks, Alaska; and petitioner Reed & Martin, Inc., is an Alaskan corporation. The returns of those four petitioners were all filed with the district director of internal revenue at Takoma, Washington. At all times here material Freitas was president and the majority stockholder of Pacific Construction Co., Ltd., a large construction company operating out of Honolulu, and had other business interests. Haugland was practicing law in Seattle. Weston was a practicing physician and surgeon in Fairbanks. Hoitt operated a food brokerage business in Fairbanks. Reed & Martin, Inc., was engaged in the general construction business, operating in Alaska, Hawaii and other places. Its president and principal stockholder was Lloyd W. Martin. During the winter of 1952 Martin, Weston and Hoitt were visiting in Hawaii with a group of other tourists from Fairbanks. Because of the difficulty they encountered in obtaining suitable accommodations *182 in Waikiki they decided that that would be a good place to invest in a housing project. Martin, being experienced in the building industry, was selected to investigate the matter. He made a check on the availability and desirability of several building sites and inquired of lending institutions about local credit for housing developments. He was informed that long-term mortgage financing on a conventional basis was difficult to obtain in Hawaii. He also consulted with the Director of Federal Housing Administration (FHA) in Honolulu about an FHA insured mortgage. Later he engaged a Seattle mortgage broker to arrange for such a loan and FHA insurance thereon. Martin later returned to Hawaii and on March 10, 1953, acquired an option to purchase a parcel of real estate at 445 Kaiolu Street, Honolulu. Martin and his wife acquired title to the property September 24, 1953. A few days later an application for mortgage insurance was submitted to FHA and was approved by FHA on February 26, 1954, for insurance on a mortgage on a proposed apartment building to be erected on the premises in the amount of $1,211,700. The application was submitted in the name of "Lloyd W. Martin & Associates, Inc. *183 ," a proposed corporation. A "Project Income Analysis and Appraisal" was filed with the insurance application showing an estimated monthly income from the apartments of $13,982. A new corporation, Rosalei Apartments, Inc., hereinafter called Rosalei Apts., was formed March 8, 1954, under the laws of the Territory (now State) of Alaska. Its articles of incorporation provided in part as follows: The purpose for which the Corporation is formed and the business and objects to be carried on and promoted by it are as follows: (a) to create a private corporation to provide housing for rent on a monthly or yearly basis to be regulated by the Federal Housing Commissioner as to rents or sales, charges, capital structure, rate of return, and methods of operation in the manner and for the purposes provided in Section 207 of Title II of the National Housing Act and the Administrative Rules and Regulations thereunder to enable the financing of the construction of such rental housing to be obtained with the assistance of mortgage insurance under the National Housing Act as amended, and as such to acquire any real estate or interest or rights therein or appurtenant thereto and any and all personal *184 property in connection therewith. So long as any property of this corporation is encumbered by a Mortgage or Deed of Trust insured under the National Housing Act it shall engage in no other business than the construction and operation of a rental housing project. (b) to improve and operate, and to sell, convey, assign, mortgage or lease real estate and personal property. * * *
* * * The total amount of the authorized capital stock of the Corporation is 2,900 shares, of which 100 shares having a par value of $1.00 per share shall be designated "Preferred Stock" and 2,800 shares having a par value of $100.00 per share shall be designated Common Stock", which shares of capital stock shall have the preferences and restrictions as hereinafter provided. Upon insurance by the Commissioner of a certain Mortgage or Deed of Trust (hereinafter called the Mortgage) said preferred stock shall be issued to the Federal Housing Administration and delivered to the Federal Housing Commissioner in order that the Commissioner, in connection with the insurance of said mortgage under the National Housing Act, may regulate and restrict the corporation as to rents or sales, charges, capital structure, *185 rate of return and methods of operation as provided in this charter and to enable the Commissioner to protect the contingent liability of the Federal Housing Administration as insurer of such mortgage. So long as said mortgage insurance shall be in effect said preferred stock shall be held by the Commissioner or his successors and shall be registered upon the books of the corporation in the name of the Federal Housing Administration or its nominees. During such period the Corporation shall not be required to change such registration, nor to recognize any persons other than the Administration, as the holders of the Preferred Stock. All voting rights were vested in the holders of the common stock, except that on the corporation's default of certain of its obligations, as defined in the articles of incorporation, FHA as holder of the preferred stock had the right to require the removal of the directors and the election of new directors. The preferred stock held by FHA could not be redeemed by the corporation so long as the FHA insured mortgage was unpaid. Under Article Eighth of the Charter, the corporation could not (a) sell, otherwise dispose of or encumber any property or rents except *186 as permitted by the mortgage; (b) remodel, reconstruct, demolish or subtract from the premises subject to the mortgage. Martin and his wife conveyed title to the land which they had acquired as a site for the apartment building to Rosalei Apts. on March 15, 1954. During the formative steps of the project, and prior to incorporation, some of the original investors died and new members including Freitas and Haugland joined the company. Freitas became interested in the project when he was negotiating with Martin, who acted as trustee for the investor company, for the construction of the apartment building by his company, Pacific Construction Co. Haugland served as counsel for Rosalei Apts. For his equity in the real estate and his advancement of funds for working capital Martin was issued 137 1/2 shares of Rosalei Apts. common stock and a promissory note dated April 27, 1954 for $207,625. The note bore interest at the rate of 4 1/4 percent and was not negotiable. It was signed by Martin as president of Rosalei Apts. The other stockholders thereafter acquired from Martin interests in the promissory note, proportioned on the number of shares held by them. A trust agreement evidencing *187 the transaction dated April 27, 1954, was executed in which Martin was named trustee and the other stockholders beneficiaries. The agreement, as revised December 11, 1957, sets forth the separate interests of, each of the parties in the promissory note as follows: Percent
Lloyd W. Martin
21.67
George E. Freitas
11.82
R. B. Hoitt
10.84
Philip A. Anderson
10.84
John I. Weston
10.84
John H. Young
10.84
James Ing
10.84
Wilbur Walker
9.85
Edward F. Medley
.74
H. W. Haugland
.74
Masaji Marumoto
.98 All of the persons were stockholders of Rosalei Apts. except Masaji Marumoto. The officers of Rosalei Apts. were Martin, president, Freitas, vice president and Haugland, secretary. None of the officers received any salary from the corporation. The proposed apartment building was to be a 12-story, fireproof building with two elevators. There were to be 153 family units, a basement garage for 42 cars, and a roof parking space for 34 cars. The first floor was to have commercial rental space to be arranged to suit the tenants. It was specified in the City Planning Commission permit that no doors or entrances to commercial premises would be located on the exterior *188 of the building. A construction loan of $1,211,700 was obtained from the Bishop National Bank of Hawaii and the Bank of California, and John Hancock Mutual Life Insurance Co., hereinafter called John Hancock, agreed to purchase the first mortgage in that amount on completion of the apartment building. On April 1, 1954, Rosalei Apts. entered into a contract with Pacific Construction Co., Ltd., hereinafter called Pacific Construction, for construction of the apartment building at a cost of $1,182,918. The construction was begun during that month. Progress payments were made to Pacific Construction each month out of the mortgage proceeds based upon the amount of work completed during the preceding month. An FHA job inspector made periodic reports on the progress of the work and the disbursements of funds to the contractor were approved by FHA. As various floors of the building were completed, Rosalei Apts. obtained permission from FHA to occupy certain of the completed units. The applications filed by Rosalei Apts. for such permits stated in part as follows: All work in connection therewith has been substantially completed and all of the above-described living units are suitable *189 for occupancy, with all fixtures and equipment installed and in operating condition. Light, heat, water, gas, and sanitary services have been connected and are available for use. The premises have been inspected by the public authorities having jurisdiction and permission to occupy granted by them as evidenced by the certificates attached hereto. Safe and adequate approaches to the site and to the aforesaid living units have been provided, including temporary or permanent guard rails, barricades, walls, lights, and other provisions necessary to the protection of tenants and the public. Proposed rental schedules or monthly charges in triplicate and mortgagor's proposal for management of the project and compensation to be paid therefor, if and as required by corporate charter, have been or are herewith submitted. The FHA inspection report of March 1, 1955, and the March 2 contractor's requisition stated that construction of the apartment building was 95.08 percent completed. By April 1, 1955, requests had been made by Rosalei Apts., and granted by FHA, for occupancy of rental apartments as follows: Request
Number of
Date of
Number
Apt. Units
Floor
Date Requested
Approval
1
42
3, 4, 5
Feb. 23, 1955
Mar. 1, 1955
2
14
11
Feb. 23, 1955
Mar. 10, 1955
3
14
10
Feb. 23, 1955
Mar. 10, 1955
4
84
2, 6, 7, 8, 9, 12
Feb. 28, 1955
Mar. 10, 1955
5
28
8, 9
Mar. 14, 1955
Mar. 21, 1955
6
28
6, 7
Mar. 14, 1955
Mar. 30, 1955
7
14
2
Mar. 22, 1955
Mar. 31, 1955
*190 Out of the total 154 (the original specifications called for only 153 units) 44 units were rented by the end of March, 81 by the end of April and 145 by the end of May 1955. The remaining 9 units were rented by June 18, 1955. The contractor's requisition dated April 12, 1955, stated that the project was 99 percent completed. In the requisition dated May 31, 1955, it was stated to be 100 percent completed. The rental receipts from the apartment and the disbursements made of the 4 months' period ending May 30, 1955, were as follows: March
April
May
June
Receipts
$14,996.63
$17,112.53
$19,635.91
$20,944.75
Disbursements
11,633.72
16,064.25
20,884.14
16,058.70
Gain or Loss
3,362.91
1,048.28
(1,248.23)
4,886.05
Several construction changes were proposed and approved by FHA during the construction period. A memorandum prepared by the FHA job inspector dated June 2, 1955, listed 7 incomplete items "as of day before final inspection." They were all of a minor nature and were completed by the contractor within a few days thereafter. One of the problems that arose in the final stages of construction was the first floor space that had been intended *191 for commercial use. The installation of partitions had been delayed so as to accommodate the needs of tenants. The effort to find commercial tenants as originally planned, however, was unsuccessful and on April 13, 1955, Martin wrote the FHA director in Honolulu as follows: The Owners and Contractor have determined that this project will be 100% complete May 1, 1955, with the exception of certain partitions for commercial space located on the first floor. It is requested that final inspection be made on approximately the aforementioned date. We have estimated the cost of completing the partition enclosures to the commercial areas and submit out estimate as follows: 1,200 Sq. Ft. of Tile Wall
$ 720.00
5 Each wood doors, frames
and hardware at $35.00
each
175.00
134 Sq. Yd. of sand finish plas-
ter at $2.00
268.00
1,200 Sq. Ft. Painting at 6 cents
per SF
72.00
TOTAL
$1,235.00
It is suggested that you consider withholding, and placing in escrow, the sum of $5,000.00 to insure completion of these items. You are aware of the fact that the construction of a swimming pool is now in progress under a Change Order, with no increase in the mortgage commitment. *192 We are of the opinion that it would be more advantageous to the project to refrain from consummating leases for the commercial space until such time as this swimming pool is completed. We believe the swimming pool facilities, when completed, will enhance the desirability of the commercial space, thereby enabling the Owners to secure a more advantageous arrangement with prospective commercial tenants. FHA's approval of the first floor change was withheld until July 20, 1955. The addition of the swimming pool was approved by FHA early in 1955 and it was finished before May 31, 1955. On that date the contractor submitted to Rosalei Apts. a statement for additional construction costs due to "Change Orders" in the total amount of $40,014.30 on which there was a balance due of $10,437.48. The items included the swimming pool, $17,500; additional piling, $16,178; and parking deck, $1,970. Payment for those changes was made directly by Rosalei Apts., rather than through the FHA mortgage. In the meantime, differences had arisen between FHA and Rosalei Apts. on several matters, including the change in the commercial space and the proposal to rent furnished apartments, with a rental charge *193 to the tenants for the furniture. Approval of the change in the commercial space was granted by FHA July 20, 1955. On August 1, 1955, the FHA job inspector made his final inspection and reported the job 100 percent completed. Notice of completion was published in the Honolulu newspapers August 16 and August 23, 1955. The escrow deposit of $5,000 to cover the future costs of the permanent partitions on the first floor was made in the Bishop National Bank of Hawaii on September 14, 1955. However, since none of the commercial space was ever rented, the partitions were never built. The commercial space was converted to apartments in 1957 at a cost of from $35,000 to $50,000. The dispute between FHA and Rosalei Apts. remained unsettled and other differences arose about management of the business. The board of directors of Rosalei Apts. decided to undertake to pay off the FHA insured mortgage and free the project from FHA supervision. John Hancock approved the refinancing and on September 20, 1955 agreed to make a mortgage loan of $900,000 free from FHA insurance. Application had been made early in February 1955 for a conventional loan of $1,200,000. An additional loan of $120,000 was *194 obtained from the Bank of California on the endorsement of the stockholders. To complete the refinancing $200,000 additional was needed, which the stockholders agreed to advance to the corporation on a pro rata basis. Four of the stockholders were unable to raise their pro rata share and their stock in Rosalei Apts. was purchased by the other stockholders. The following amounts were then advanced to Rosalei Apts. by the stockholders: Payee
Date
Amount
R. B. Hoitt
11/23/55
$34,600.80
Lloyd W. Martin
11/23/55
69,175.20
H. W. Haugland
11/23/55
40,260.00
George Freitas
11/23/55
37,747.20
John I. Weston
11/23/55
34,600.00
P. A. Johnson
11/23/55
23,616.00 Rosalei Apts. gave the stockholders its promissory notes dated November 23, 1955, in the aggregate amount of $240,000, secured by a second mortgage on the corporation's properties. The notes were payable in 10 years from the date of issuance. On completion of the refinancing, Rosalei Apts, sent a letter to each of its tenants reading, in part, as follows: Recently we have consummated a conventional loan on this project and the stockholders have invested a sizeable outlay of capital. There are *195 no plans to operate this project on a transient basis. We welcome the patronage of the long term tenants and the opportunity to serve you. We feel that, under our new financing arrangements, better service can be contributed by the management but certain adjustments in the rental schedule must be effected, keeping pace with good, sound business practices and, at the same time, thinking of the welfare of our tenants. Territorial Investors, Inc., was a corporation organized under the laws of the Territory of Alaska on February 28, 1955, by Lloyd Martin, president; Herbert Haugland, secretary-treasurer; and Dorothy Haugland (his wife), vice president. Martin was issued 6 shares and the Haughlands 2 shares each of the company's common stock of a par value of $50 each. The corporation had a brief existence. Its chief function was to take over certain phases of Rosalei Apts. operations, such as managing the commercial space and furnishing maid and laundry service for the apartment tenants. FHA consented to that arrangement with the condition that it would not circumvent its control over the commercial space or the rental of furniture to tenants. After the refinancing of the project was *196 completed, Territorial Investors, Inc., was dissolved on September 7, 1956. In the fall of 1956, a Honolulu real estate broker, Lloyd Carlos, proposed to Martin that Rosalei apartments be converted to cooperative ownership. He wrote a letter to Martin, dated October 16, 1956, in which he outlined the proposal as follows: It is my firm belief that the Rosalei can be successfully sold to the public as a cooperative under the general terms as outlined by you: a selling price of $2,225,000; $500,000 required in cash down payments, on a favorable lease of at least 55 years, with term payments of 20 years or more to include 5% interest. It must be remembered that to be successful the plan must be attractive to the present tenants. The following example illustrates that this can be done: A one-bedroom apartment in the Rosalei will average $15,000. A 25% down cash payment of $3750 will leave a balance of $11,250, paid off on a 20-year note at 5% interest will amount to $74.25 monthly. This amount, plus an estimated $35 monthly maintenance charge, would total $109.30. The purchaser, in turn, would benefit income tax-wise by a deduction on his pro rata share of real property taxes and *197 interest monies of approximate $400 yearly. This would bring down his cost to about $100 monthly if he is in the 25% tax bracket. The present tenant in the Rosalei living on the sixth floor in an unfurnished apartment is paying $116 monthly, this rent money being a total loss to him. If he purchased this same apartment under the co-op plan, he would not only be saving himself $16 a month, but will have an initiated a fine savings plan by building up equity in his apartment. To make it even more attractive to the purchaser, a 25 year note could be offered instead of a 20 year note. This would lessen the monthly payments by an addition at $8.48, or $25 a month less than present rent. I fully appreciate the present position of the corporation enjoying a no-vacancy rate at the Rosalei. However, in presenting a cooperative plan, a tactful approach to the tenants can be made. An introductory letter can be written outlining the plan for the tenant's consideration. The selling job at this point requires diplomatic handling without bringing undue pressure on the present tenants. These tenants have certain legal and moral rights to such possession and will feel that they have such rights. *198 They will also be critical of any defects or deficiencies that exist in the building. They will also more closely scrutinize the proposed plan than outsiders. The main issue of concern will be if the cooperative plan compares favorably with their rental position. Only when certain that the present tenant does not intend to buy should the apartment be offered to outsiders. This had been done successfully many times before. The other stockholders were informed of the proposal and agreed to it, after consultation with accountants as to the tax consequences of their sale of the Rosalei Apts. stock. The stockholders were willing to sell only if they could report their profits as long-term capital gains. On November 16, 1956, the auditor for Rosalei Apts., Herbert F. Lofquist, wrote Martin as follows: In considering the first phase - that of the mortgage, we have discussed the problem with both Roy Sumpter and Herb Haugland. It is Roy Sumpter's idea that a plan be worked out similar to that which is at present being worked out by the Waikiki Tower Apartments in Honolulu. That is, that the title to the land remains in the Rosalei Apartments, Inc. and that the building and furniture be *199 leased to the co-op corporation on a long term lease - the total lease payments being the purchase price of the building and contents. The stockholders of the co-op corporation would be the proprietory tenants of the corporation and the ownership in the leasehold would be evidenced by their stockownership of the co-op corporation stock. Roy says that this plan is workable as far as the sale of the apartment units and that of course in this manner there is no change in the ownership of the real property and consequently no change with respect to the mortgage. While this plan might be satisfactory as far as meeting the requirements of phase number one of our problem - that of not disturbing the mortgage - it is undesirable from the standpoint that taxable gain will result to the Rosalei Corporation and then upon final distribution to the stockholders of Rosalei an additional tax attaches. Upon a complete liquidation this would be taxed at capital gain rates (25%) but in any event we have a double tax. * * *
From your real estate broker's letter, it appears that now is the time to move on the switch to a co-op. Peat Marwick & Mitchell C.P.A.'s in Honolulu have determined that Rosalei *200 would be classed as a collapsible corporation and their advice to you is not to make a sale until after March 31, 1958. While we do not agree fully with Peat Marwick & Mitchell we cannot, without getting a ruling, be 100% certain that Rosalei is not a collapsible corporation. Therefore, the problem is to find some way in which the co-operative deal can be put into effect right away and still have the gain on the sale be a long term gain. We have kicked around many alternatives and after our discussion with Herb Haugland it appears that the best procedure to follow is to enter into a lease agreement with the co-op corporation immediately tied in with an option whereby the Co-op Corporation can buy the Rosalei stock from the individual stockholders after March 31, 1958. Herb Haugland is checking further into the legal aspects to see if there are any stumbling blocks but he feels that the plan is workable. A plan was finally agreed upon under which a new co-operative corporation was to be formed to take over the apartments and sell them to individual purchasers. The plan was later changed so that only the use and occupancy of the apartments, and parking space, would be transferred to *201 the individual purchasers under a long-term proprietary lease. The new corporation, Rosalei, Limited, hereinafter called Rosalei, Ltd., was organized under the laws of the State of Hawaii on March 15, 1957. It was capitalized at $1,000 divided into 1,000 shares of common stock of a par value of $1 each. All of the stock was issued to Jens Lu Vern Lerback, who was then manager of Rosalei Apts. The initial officers and directors of Rosalei, Ltd., were Lerback, president and director; Suyeki Okumura, vice president, treasurer and director; and Roy E. Takushi, secretary and director. Okumura was an attorney who handled Rosalei Apts. legal work in Hawaii, and Takushi was a law partner of Okumura. On April 1, 1957, an option agreement was entered into by Rosalei, Ltd., and the stockholders of Rosalei Apts., giving Rosalei, Ltd., the right to purchase all of the stock in Rosalei Apts. and the exclusive right to occupy all of the land and apartment building owned by that company for a period of 75 years commencing April 1, 1958. The purchase price was $2,600,000, reduced by the amount of Rosalei Apts. debts as of April 1, 1958, and certain discounts specified in the option agreement. *202 The option agreement provided that this option shall be exercised only on April 1, 1958 and by the optionee giving written notice to all of the optionors or the stockholders and paying $600,000 of the purchase money to the escrow agent. The balance of the purchase price was to be paid in equal monthly installments over a period of 20 years beginning May 1, 1958. The option agreement further provided that the optionee and its tenants would be permitted to occupy the premises until March 31, 1958, in consideration for the payment to Rosalei Apts. of the rentals received. A Honolulu real estate agent, Marion Blair, was given an exclusive agency to sell the apartment and parking space occupancy rights (sales of such occupancy rights will be referred to hereinafter as sales of the apartments themselves). In each such sale a tenant's agreement was entered into between Rosalei, Ltd., and the purchaser providing for a down payment of 25 percent of the purchase price and the execution of a promissory note for the balance, payable over a 20-year period beginning April 1, 1958. The down payment was later reduced. Rosalei, Ltd., reserved the right to terminate the contract and refund the *203 amount paid on the purchase price if it had not sold at least 80 percent of the apartments by January 31, 1958. Attached to the tenant's agreement were forms for an escrow agreement and a proprietary lease which the tenant agreed to execute on the closing of the agreement of sale of Rosalei Apts. stock. The amounts paid to Rosalei, Ltd., by the purchasers was to be held in escrow until Rosalei, Ltd., either exercised or failed to exercise the option to purchase the stock of Rosalei Apts. Under the April 1, 1957 agreement, if the option were exercised the funds were to be paid over to Rosalei Apts. stockholders and, if not, they were to be returned to the purchasers. Following an amendment of the Hawaiian Registration of Securities Act, exempting the sale of securities by a residental cooperative corporation from registration requirements, Rosalei, Ltd., on January 10, 1958, modified the plan for converting to cooperative ownership so as to provide for the sale of the company's capital stock to the purchasers of apartments and, at the same time, authorized an increase in the company's capital stock. By December 31, 1957, far less than 80 percent of the apartments had been sold. *204 The amount of the payments held in the escrow account was $115,080. Nevertheless, it was decided to continue the sales program, and the purchasers were so advised. At April 1, 1958, 110 apartment units and 21 car spaces had been sold for a total consideration of $1,680,800. The rent rebate on the purchase price amounted to $76,739.35, leaving net total payments of $1,604,060.65. The down payments amounted to $297,940.96, leaving a balance to be paid by tenants of $1,306,119.69. The cash balance in the escrow account at April 1, 1958, was $158,721.46. On being notified of the changes in the plan to permit them to purchase the stock of Rosalei Apts., 22 of the purchasers rescinded their purchase agreements and their payments were refunded to them. The other purchasers acceded to the changes and subscribed for shares of the Rosalei, Ltd., stock. On March 30, 1958, Rosalei, Ltd., notified the Rosalei Apts. stockholders that it would be unable to exercise its option to purchase all of the shares on April 1, 1958. Under the agreement of April 1, 1957, the stockholders decided to modify the plan to make it more attractive to purchasers and to have Rosalei, Ltd., continue the sales efforts. *205 One of the problems the stockholders encountered was gaining the consent of all of the stockholders to the new plan. One of the major stockholders, Philip A. Johnson, had died and the First National Bank of Portland, acting as his administrator, was reluctant to covenant to the sale. A meeting of the Rosalei Apts. stockholders was held in Honolulu in March 1958 for a further discussion of the sale of the stock. The Johnson estate was represented at this meeting, and in further negotiations, by Milton Cades, the Honolulu attorney who represents petitioners in these proceedings. Drafts of a new stock purchase agreement, pledge and assignment of notes and mortgages and escrow agreement, were prepared and submitted to the stockholders for their approval. The several documents were drafted during April and May. They were passed back and forth between various stockholders and counsel and, after numerous changes to meet the objections raised, were finally approved. The last stockholder to approve was the Johnson estate. The administrator executed the last of the instruments on June 27, 1958. On the same date the Oregon court having jurisdiction of the estate authorized its sale of the *206 Rosalei Apts. stock. The instruments properly executed were delivered to the escrow agent, the Bank of California, on June 30, 1958. They all bore the date April 1, 1958. Under the new stock purchase agreement Rosalei, Ltd., purchased all of Rosalei Apts. stock for $1,650,000, of which $250,000 was payable in cash and the balance in monthly installments equal to the amounts received by Rosalei, Ltd., from all sources, less the costs and expenses of operating the apartment building, less also a cash reserve of $1,500, and certain of Rosalei, Ltd.'s liabilities. To secure its obligations under the stock purchase agreement, Rosalei, Ltd., assigned to the stockholder all the capital stock of Rosalei Apts., all of the promissory notes and mortgages executed by apartment purchasers, and all income from any source except certain amounts from its (Rosalei, Ltd.) stockholders designated "rent." The collateral securities were to be reassigned to Rosalei, Ltd., when the obligations to the stockholders were fully paid. Under the new escrow agreement all funds received by Rosalei, Ltd., from the sale of apartments were to be paid into the escrow bank and were to be applied, first, to meet *207 Rosalei, Ltd.'s scheduled payments to Rosalei Apts.; second, to defray the costs and expenses of operating the apartment building; and third, to meet the payments due the Rosalei Apts. stockholders under the stock sale agreement. The escrow agreement further provided that the escrow agent might make the monthly payments due on the John Hancock mortgage and deduct such payments from the amounts due the Rosalei Apts. stockholders. It was required to do so after the first 10 years. Under the lease agreement the land and apartment building were leased to Rosalei, Ltd., for 75 years beginning April 1, 1958, at an annual rental of $75,000 for the first 10 years and $62,500 for the next 8 years. The rental for the remaining 57 years was to be fixed by later agreement. Rosalei, Ltd., was to pay advance rentals of $180,000 in 7 installments beginning April 15, 1958. The old escrow agreement of April 5, 1957 with Cooke Trust Co., was terminated May 10, 1958 and the funds then held in that account as well as those later received were transferred to the new escrow bank. Following is a schedule of the payments made to the Rosalei, Ltd., stockholders by the escrow agent up to April 12, 1961: *208 Payment
Payment
Date of
on
on
Principal
Payment
Interest
Principal
Balance
7/10/58
$250,000.00
$1,400,000.00
2/13/59
$45,854.50
1,400,000.00
4/28/59
Cost of Sale
5,000.00
1,395,000.00
6/20/59
13,000.63
6,999.37
1,388.000.63
3/20/60
30,000.00
1,388,000.63
3/20/60
Cost of Sale
2,500.00
1,385,500.63
7/26/60
20,000.00
1,385,500.63
10/20/60
20,000.00
1,385,500.63
2/20/61
20,000.00
1,385,500.63
3/16/61
Cost of Sale
2,500.00
1,383,000.63
4/12/61
20,000.00
1,383,000.63
On March 31, 1958, the stockholders surrendered to Rosalei Apts. as capital contributions their interests in the promissory note of April 27, 1954, which the corporation had issued to Martin for the monies advanced for purchase of the real estate, and also their interests in the several promissory notes which Rosalei Apts. had issued to them November 23, 1955 for their loans to the corporation to refinance its mortgage. The basis of the Rosalei Apts. stock in the hands of the stockholders at the time of its sale to Rosalei, Ltd., is shown by the following schedule: Loan
Total
Stock
Loan
(2nd Mortgage
Investment
Stockholders
Shares
Cost
(Trust Note)
Note)
and Loans
G. E. Freitas
24.422
$ 5,738.75
$ 24,472.75
$ 31,456.00
$ 61,667.50
Herbert W. Haugland
26.049
12,622.05
26,970.25
33,550.00
73,142.30
Reed & Martin, Inc
44.757
10,586.73
44,791.57
57,646.00
113,024.30
John I. Weston
22.386
5,260.16
22,432.84
28,834.00
56,527.00
R. B. Hoitt
22.386
5,260.16
22,432.84
28,834.00
56,527.00
Estate of P. A. Johnson
15.280
1,528.00
14,972.00
19,680.00
36,180.00
Totals
155.28
$40,995.85
$156,072.25
$200,000.00
$397,068.10
*209 The estimated sale price of the Rosalei Apts. stock sold by each of the petitioners and the amounts received by each of them in 1958 were as follows: Amount
Estimated
Received
Petitioner
Sales Price
in 1958
G. E. Freitas
$259,512.00
$34,893.28
Herbert W. Haugland
275,109.99
37,216.09
Reed & Martin, Inc.
475,597.50
63,945.13
John I. Weston
236,438.80
26,938.81
R. B. Hoitt
237,880.00
31,984.76
Estate of P. A. John-
son
In their income tax returns, Freitas, Haugland, Hoitt and Weston all reported their gain on the sale of Rosalei Apts. stock on the installment basis and as long-term capital gain. Weston included in his basis for the stock his contingent liability for payments to John Hancock under the stockholders' first mortgage agreement estimated at $22,342.93. Reed & Martin did not report the sale of its stock in its 1958 return. It was advised by its accountant who prepared the return that because of its contingent liability to John Hancock it could elect to report its gain on the recovery of cost method. It so elected and applied all of the amount received in 1958 to its cost basis, leaving no taxable gain. Respondent has *210 determined that the sale of the Rosalei Apts. stock to Rosalei, Ltd., took place in 1957 rather than 1958, or in the alternative, that it took place in 1958; that Rosalei Apts. was a collapsible corporation within the meaning of section 341 of the Internal Revenue Code of 1954, and that petitioners' gain on the sale of the stock is taxable as ordinary income and not as long-term capital gain. He further determined that Reed & Martin is not entitled to report its gain on the sale of the stock under the cost recovery method and that the petitioners who reported their gain on the installment basis are not entitled to do so because they did not so elect in a return timely filed. Opinion Issue I Respondent has determined as to each of the petitioners that their gain on the sale of their Rosalei Apts. stock is taxable to them as ordinary income under section 341, I.R.C. 1954. Section 341(a) provides that in the case of a sale or exchange of stock of a "collapsible corporation" the gain shall be treated as gain from the sale of property which *211 is not a capital asset. Section 341(b) defines a collapsible corporation as follows: SEC. 341. COLLAPSIBLE CORPORATIONS. (b) Definitions. - (1) Collapsible corporation. - For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to - (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. Petitioners oppose respondent's determination on two grounds. They contend that Rosalei Apts. was not a collapsible corporation as defined in the statute and, further, that the gain realized on the sale of its stock is excluded from treatment *212 under section 341(a) by subsection 341(d)(3). [2]
Admittedly, section 341(d)(3) applies here if more than three years elapsed between the date of completion of construction of the Rosalei apartments and the date of the sale of the stock by petitioners. While the evidence, we think, supports petitioners' contention that the sale took place more than three years after completion of construction of the apartment building, we regard as the stronger position petitioners' contention that Rosalei Apts. was not a collapsible corporation. The evidence is convincing that it was not formed with a view to the sale of its stock, and was not availed of for that purpose until long after the apartment building was completed. Rosalei Apts. was therefore not a collapsible *213 corporation under the test laid down by respondent's regulation, section 1.341-2(a)(3), and the decided cases. Glickman v. Commissioner, 256 F. 2d 108 (C.A. 2, 1958), affirming a Memorandum Opinion of this Court; Raymond G. Burge, 28 T.C. 246 (1957), affd. 253 F. 2d 765 (C.A. 4, 1958); Jesse Hartman, 34 T.C. 1085 (1960), affd. 296 F. 2d 726 (C.A. 2, 1961); Charles J. Riley, 35 T.C. 848 (1961); Maxwell Temkin, 35 T.C. 906 (1961); and Southwest Properties, Inc., 38 T.C. 97 (1962). The evidence is uncontradicted that the "view" to convert the apartments to cooperative ownership was not formulated, or even conceived, by any of the investors until it was proposed to them by a Honolulu real estate broker at some time in the fall of 1956. The broker put the proposal in writing in a letter to Martin dated October 16, 1956. The matter was then brought to the attention of the other stockholders and the plan (view) was not formulated until some time later. The evidence is that the apartment building was completed not later than March or April 1955. The completion date urged by *214 respondent is August 1, 1955, the date on which the FHA inspector made his final inspection and found the project 100 percent completed. In any event, the construction of the building was completed and it was in full operation before any plan for its conversion to cooperative ownership was considered by the stockholders. Issue II Petitioner Reed & Martin's shares of the selling price of the Rosalei Apts. stock was $475,597.50, and it received $63,945.13 of that amount in 1958. Its cost basis was $113,024.30. It did not report any gain on the sale in its 1958 return, electing to report the gain on the recovery of cost, or deferred payment, method under section 1.453-6(a)(2) of the regulations. Its books were kept, and its returns prepared, on an accrual basis. As we have heretofore pointed out, the regulations pertain to real estate only and there is no authorization in the statute or the regulations for taxpayers on an accrual basis to report gain from a casual sale of personal property, such as the stock here in question, on the deferred payment method. A taxpayer on the accrual basis *215 must either accrue the gain on the sale or report it on the installment basis. George L. Castner Co., 30 T.C. 1061 (1958). Petitioners' argument that the effect of the regulations should be extended in this instance to sales of personal property has no sound basis and must be rejected. The argument is advanced by petitioner in support of its right to report the sale on the deferred payment method that the amount which it would ultimately receive for its stock remained uncertain because of the stockholders' contingent liability to John Hancock on the mortgage note. For reasons discussed below, under Issue III, we think that this liability was too remote and indefinite to be taken into account in computing the gains on the sale. Income must be reported annually and cannot be deferred or reduced by a contingency which is so remote and indefinite that it cannot be evaluated with reasonable certainty. See Fawsett v. Commissioner, 63 F. 2d 445 (C.A. 7, 1933), affirming 23 B.T.A. 1148 (1931), certiorari denied 290 U.S. 641 (1933); William M. Davey, 30 B.T.A. 837 (1934). Petitioner contends further that if it is denied *216 the right to report the gain on the sale of its Rosalei Apts. stock on the deferred payment method, it is entitled to elect the installment method, and it now so elects. Petitioner did not make any such election in its return for 1958. In fact, it did not report the sale at all. Since the amount which it received in 1958 was less than its cost, it had no gain to report under the recovery of cost method. The election now made by petitioner to report the sale on the installment basis, we think, is untimely. It has been held repeatedly that the benefits of reporting on the installment basis are available to taxpayers only where a timely election to so report has been made in their returns; and where no election of the installment method has been timely made for the year of the sale, or some other method chosen, whether through inadvertence or under a misapprehension of the tax consequences of the transaction, a later election of the installment method is not available. See Pacific National Co. v. Welch, 304 U.S. 191 (1938); United States v. Kaplan, 304 U.S. 195 (1938); *217 Sarah Briarly, 29 B.T.A. 256 (1933); W. T. Thrift, Sr., 15 T.C. 366 (1950); W. A. Ireland, 32 T.C. 994 (1959). The facts here are almost identical with those in the Ireland case. There has been some modification of the "strict rule" of the Briarly, Thrift, Ireland and like cases, where the failure to make an election in the return filed was due to reasonable cause, such as where the taxpayers received no income to report in the year of the sale and elected the installment method in the year when income was received, Jack Farber, 36 T.C. 1142 (1961), affd. 312 F. 2d 729 (C.A. 2, 1963), certiorari denied 374 U.S. 828 (1963); or where the taxpayers reported the sale but mistakenly claimed nonrecognition of the gain under section 1034, I.R.C. 1954, John F. Bayley, 35 T.C. 288 (1960); Nathan C. Spivey, 40 T.C. 1051 (1963); or where the income received in the year of the sale was reported in taxpayer's return as ordinary business income, through "an honest mistake" rather than income from the sale of specific property, John P. Reaver, 42 T.C. 72 (1964). *218 In our opinion in the Reaver case we said (at page 81), after a review of the above-cited and other related cases, that: Generally, an election is to be exercised when the occasion for doing so arises. See Jack Farber, supra. Here, petitioners made an honest mistake and rectified it at the first opportunity. We discern no reason why petitioners' amended return for the year of sale, filed within the period for determining a deficiency for 1958 or for any year affected, should not be deemed to be compliance with the requirements of the regulations. Petitioners have never adopted any position inconsistent with that reflected in the amended return; they have never represented that they were using any other method to account for their gain on the sale; the entire receipts were included in income; all the information required by the regulations was supplied in the amended return; and respondent at no time could have been misled to his disadvantage. In none of those later cases, however, had the taxpayers made any election as between the installment method and some other available method of reporting the sale. *219 There has been no modification of the rule of Pacific National Co. v. Welch, supra, that once such an election has been made it is binding upon both the taxpayer and the Commissioner. Petitioners' failure to report any gain on the sale in its 1958 return admittedly was due to its election to report the sale on the deferred payment method. The failure of that method as herein determined does not now entitle petitioners to a new election of the installment method. Issue III Petitioner Weston, in reporting his profits on the sale of the Rosalei Apts. stock, included in its cost his contingent liability on the John Hancock mortgage note in the amount of $22,342.93. That was the amount of the liability as estimated by the accountant who prepared the return. According to the accountant's testimony, the estimate was based on a projection of the receipts and disbursements relating to the sale of the apartments over the life of the contracts. The $22,342.93 was Weston's pro rata portion of the $154,976.28 which, according to the accountant's analysis, the stockholders of Rosalei Apts. would be required to pay into the corporation over the 5-year period beginning in the 13th *220 and ending in the 18th year of the apartment's operations. The accountant admitted that the estimates were based on a number of unknown factors or "guesstimates." As we have said, we think the estimates are too indefinite and the contingency of the liability too uncertain to be taken into account in computing the gain on the sale. If the stockholders are, in fact, later called upon to make any such payments the matter can be adjusted in their returns for those years. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Herbert W. Haugland and Dorothy A. Haugland, Docket No. 2703-62; John I. Weston and Gwendolyn T. Weston, Docket No. 4829-62; Robert B. Hoitt and Grace P. Hoitt, Docket No. 4830-62; and Reed & Martin, Inc., an Alaskan Corporation, Docket No. 4799-63.↩
2. Sec. 341(d) Limitations on Application of Section. - In the case of gain realized by a shareholder with respect to his stock in a collapsible corporation, this section shall not apply - * * *
(3) to gain realized after the expiration of 3 years following the completion of such manufacture, construction, production, or purchase.↩