CARMEL M. BRONSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bronson v. Commissioner
Docket No. 5211-91
United States Tax Court
T.C. Memo 1993-233; 1993 Tax Ct. Memo LEXIS 235; 65 T.C.M. (CCH) 2791; May 25, 1993, Filed *235 Decision will be entered under Rule 155. Carmel M. Bronson, pro se. For respondent: William S. Garofalo, Brendan G. King, and James Gehres. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income tax: Additions to Tax under Sections
Year
Deficiency
6651 6653(a)
6653(a)(1) 1978
$ 18,830
$ 4,708
$ 942  -- 1980
24,269
6,067
1,213
-- 1981
34,954
8,244
-- $ 1,748
1982
34,507
8,089
-- 1,725
1983
2,675
237
-- 134
Additions to Tax under Sections
Year
6654 6659
6653(a)(2) 6621(c)
1978
$ 787  -- --
[2]
1980
1,546
-- --
[2]
1981
2,489
$ 10,486
[1] [2]
1982
3,098
10,352
[1] [2]
1983
31
803
[1] [2]
*236 All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for decision are: (1) Whether petitioner is entitled to depreciation and other deductions and investment tax credits relating to art masters purchased from Jackie Fine Arts, Inc.; (2) whether, and if so, to what extent, petitioner is entitled to deductions of losses claimed from either or both Resort Timeshare Marketing Associates, Ltd. or Resortimeshare Development Associates, Ltd. II; (3) whether petitioner is liable for an addition to tax under section 6651(a)(1) for failing to timely file a Federal income tax return for each of the years in issue; (4) whether petitioner is liable for an addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a) for 1979 and 1980, and under section 6653(a)(1) and (2) for 1981 through 1983; (5) whether petitioner is liable for an addition to tax under section 6654 for underpayment of estimated tax for each of the years in issue; and (6) whether petitioner is relieved of liability as an innocent *237 spouse under section 6013(e). Each of these issues except the last was decided as to petitioner's husband (Mr. Bronson) in Bronson v. Commissioner, T.C. Memo. 1992-122 (Bronson I). FINDINGS OF FACT To a substantial extent, the stipulations of facts incorporate the testimony and exhibits (including respondent's expert witness reports, stipulations of facts, and the statement regarding the stipulated settlement of issues) in the record in Bronson I. The stipulations of facts and attached exhibits are incorporated herein by this reference. Inasmuch as the Court in Bronson I made detailed findings of fact relating to the background of the transactions in issue, we here set forth only the salient facts. Petitioner resided in Morrison, Colorado, on the date the petition was filed in this case. Art Masters
Jackie Fine Arts, Inc. (Jackie) is a corporation that sold art masters. An art master consists of a metal plate or plates, mylars, or other tangible property from which prints can be made. The painting or other original work of the artist from which the plate is modeled was not included by Jackie as part of the art master. Jackie would arrange *238 for the printing of a limited edition from the plate for an additional fee, or alternatively, an investor could arrange to contract out the printing. The limited edition prints were signed by the artist. Jackie sold the copyright and other marketing and production rights for the image produced from the art master, which entitled the investor to produce posters and other ancillary products, such as note cards. From 1977 through 1980 or 1981, Jackie sold approximately 2,500 art masters. In 1977 and 1978, Jackie sold its art masters for cash, short-term promissory notes secured by letters of credit, and long-term nonrecourse notes. In 1979 and 1980, the long-term notes were partially recourse. Some contracts contained a provision which allowed investors to return inventory or ancillary products produced by them in payment of their recourse liabilities. From 1978 through 1981, Mr. Bronson promoted sales of Jackie art masters through presentations to tax professionals. The sales presentations included an information memorandum and an illustration of the purported tax consequences to investors. Both the information memorandum and illustration of tax consequences focused on purported *239 tax benefits; for the year of purchase such benefits averaged $ 4 of tax writeoffs for each dollar invested. The commissions paid to Mr. Bronson by Jackie were based on the amount of cash and secured short-term notes required under the contracts sold, without regard to the total purchase price or the amount of the long-term notes (whether recourse or nonrecourse). As a promoter, Mr. Bronson received a discount on the initial cash payment if he purchased an art master, with a corresponding increase in the long-term note, resulting in the same total purchase price. Mr. Bronson and a partnership, High Country Images, Ltd. (High Country), in which he was a 75-percent partner, purchased three art masters (Dead Giveaway, Rocky Mountain Freighter, and Dreams of Eldorado I and II) from Jackie, on December 30, 1978, December 22, 1979, and December 28, 1980, respectively. (These art masters are herein referred to individually as Dead Giveaway, Freighter, and Dreams of Eldorado.) The prints for Dead Giveaway were from a serigraph by William Schwedler, known to some extent in New York and San Francisco, but almost unknown in the West. The prints for Freighter and Dreams of Eldorado were *240 from etchings by Roy Purcell, who did not have a national reputation, but was known in certain western locations, such as Denver. Mr. Purcell received $ 3,000 in cash, and a $ 165,000 nonrecourse note, for each art master he sold to Jackie. He was also paid $ 4,500 for the printing of each. He eventually sold Jackie 16 art masters, each with 250 limited edition prints; he received no payments on the nonrecourse notes. The record is silent as to the amount received by Mr. Schwedler. For each art master purchased from Jackie, Mr. Bronson and High Country made an initial $ 5,000 or less cash payment and gave a long-term note, on which principal and interest was not due until maturity. The purchase price for the three art masters, including the nonrecourse portion of the long-term note, was: Art Master
Purchase price
Nonrecourse portion
Dead Giveaway
$ 280,000
$ 275,000
Freighter
315,000
282,247
Dreams of Eldorado
265,000
169,000
The agreement for Freighter provided for the return to Jackie of items produced using the art master image (inventory), the value of which would first reduce the recourse liability and then the nonrecourse liability. The agreement for *241 Dreams of Eldorado had a similar provision regarding inventory return. Under the purchase agreement, 50 percent of the net receipts from the sale of prints and ancillary products was to be paid on the long-term notes until such debts were satisfied. Jackie routinely forgave the recourse liabilities relating to art master purchases if investors returned the art master and limited edition prints. No attempt was made to verify whether the fair market value of the art masters and related prints was equal to the amount outstanding on the notes. Mr. Bronson received an offer to return art masters and prints in exchange for Jackie's forgiveness of recourse liabilities. Mr. Bronson or High Country received appraisals for each of the three art masters in excess of $ 300,000. The record does not reflect when these appraisals were prepared, but each is dated after the sale of the art master being appraised. In 1980, the recourse portions of the notes for the purchase of Dead Giveaway and Freighter were increased; the term of the note for Dead Giveaway was extended. Edward Koplin, Mr. Bronson's partner in High Country, owned a retail gallery in Denver. Mr. Koplin also owned a marketing *242 and distribution company named Authenticated Graphic Editions Internationale, Ltd. (AGE) which was primarily an art wholesaler. AGE was made the exclusive distributor of Dead Giveaway, Freighter, and Dreams of Eldorado. The AGE agreements required a $ 500 initial payment and a $ 2,500 payment due after the plates or limited editions were received; both payments were to be used to market the products from the art master. AGE was to receive a nonrefundable commission of 40 percent of gross receipts from all sales, and an additional 10 percent of gross receipts, which was refundable if not actually spent on marketing or retained as "reasonable compensation" for AGE. AGE sold nine Freighter prints from 1980 through 1982 and three Dreams of Eldorado prints in 1982 for total sales proceeds of $ 1,430 and $ 480, respectively; from 1983 through 1989, there was at most one sale of the art master prints for $ 300. A few of the Jackie art master prints were sold by Chatfield Frameworks and Gallery, a custom framing shop and gallery in which Mr. Bronson and petitioner were partners. Mr. Bronson and petitioner filed joint Federal income tax returns for 1980 through 1982 claiming depreciation *243 deductions for Jackie art masters as follows: Depreciation claimed
Art Master
Basis
1980
1981
1982
Dead Giveaway
$ 65,000
$ 10,543
$ 8,200 $ 7,222 Freighter
86,147
18,113
15,094
12,578
Dreams of Eldorado
72,000
8,000
14,333
11,944
Investment tax credits were also claimed on the returns for these years; however, the source for the credits was not clearly identified. [1]
An unsigned Form 1040 for 1979 sent by Mr. Bronson and petitioner to the Internal Revenue Service claims a $ 140,000 basis in an "ART MASTER" acquired in "12/78", $ 27,259 in related depreciation, $ 14,340.50 of loss from High Country, and $ 3,090 of investment tax credit based on $ 157,500 of property of High Country. The 1979 tax return filed by Mr. Bronson and petitioner *244 (in 1989) does not show depreciable basis for any Jackie art masters, but claims an $ 11,863 investment tax credit based in part on High Country property in the amount of $ 23,102. [2]
In Bronson I, respondent presented expert testimony by Karen Carolan and Larom Munson. Ms. Carolan projected that optimistically only between 10 to 25 percent of each Jackie art master limited edition would be sold, and that even if the entire limited edition was sold, the net sales proceeds would be less than $ 46,000 for each. Her estimates and projections were based in part on the huge volume of prints by these artists which were placed on the market by Jackie. Mr. Munson projected that a good marketing effort would result in limited edition sales of 5 percent for Dead Giveaway, 15 to 17 percent for Freighter, and 20 percent for Dreams of Eldorado. He estimated the total value of these limited editions as $ 500, $ 3,000, and $ 3,250, respectively. His estimates were *245 also based on the fact that the market was "flooded" with Jackie prints. Ms. Carolan and Mr. Munson each testified that there was little chance that either posters or other ancillary products from these art masters would be marketed successfully. Timeshare Partnerships
Mr. Bronson was the sole shareholder and president of Resort Timeshare Management Company, Inc. (Management). Management was a subchapter S corporation formed under the laws of the State of Delaware. Resort Timeshare Marketing Associates, Ltd. (Marketing) was an accrual method, calendar year, limited partnership formed under the laws of the State of Colorado on December 4, 1980. Management was the sole general partner of Marketing. Mr. Bronson was the initial limited partner of Marketing, but agreed to withdraw upon the admission of additional limited partners. Mr. Bronson was not issued Schedules K-1 relating to Marketing for 1980, 1981, or 1982. International Vacation Resorts, Inc. (IVR) was organized in November 1980 under the laws of the State of Colorado for the purpose of creating and marketing timeshare intervals. Mr. Bronson owned one-third of the stock in IVR, and was on its board of directors. *246 On December 4, 1980, Marketing and IVR entered into an agreement providing for IVR to be the exclusive agent in certain countries to market timeshare intervals in the United States and Bermuda (the Marketing/IVR agreement). [3] Marketing agreed to pay IVR a nonrefundable "minimum annual marketing fee" in an amount equal to 125 percent of the limited partners' total initial capital contributions to Marketing. IVR was to be paid a commission of 50 percent of the gross retail sales price of the timeshare intervals sold to which the cumulative fees paid would be credited. Payment of the fee could be deferred by Management if the limited partners assumed personal liability for payment. The Marketing/IVR agreement was amended on March 30, 1981, to require a minimum annual fee of $ 712,500, plus an amount equal to two times the initial capital *247 contributions of the limited partners admitted in 1981. As of December 31, 1980, Marketing had not acquired any asset from which timeshare intervals could be marketed. At the end of 1981, Marketing had acquired an option to purchase from IVR the Old Adobe Resort in Tucson, Arizona. The partnership returns for Marketing reflect the following deductions for marketing fees: Taxable period Amount Dec. 30 to 31, 1980
$ 712,500  Jan. 1 to Dec. 31, 1981
1,612,500
Jan. 1 to Dec. 31, 1982
1,612,500
$ 3,937,500
These returns show deductions for management fees in the amounts of $ 36,000 for 1981 and $ 39,000 for 1982. Marketing did not file partnership returns for tax years after 1982. Resortimeshare Development Associates, Ltd. II (Development) was an accrual method, calendar year, limited partnership formed in 1981 under the laws of the State of Colorado. Management was the sole general partner of Development. Mr. Bronson was a limited partner in Development. Attached to the private placement memorandum for Development is an unsigned agreement dated December 30, 1981, between Development and IVR, which is similar to the Marketing/IVR agreement. As of December *248 31, 1981, Development had not acquired any assets which could be marketed as timeshare intervals. At the end of 1982, Development had acquired an option on a boat named White Peppa for $ 17,090, a creditor interest of $ 1,005,000 in a boat named Romance, and made a $ 120,623 downpayment on a boat to be built named Skipperliner. The partnership returns for Development reflect the following deductions for marketing fees: Taxable period Amount Dec. 30 to 31, 1981
$ 1,025,000
Jan. 1 to Dec. 31, 1982
1,025,000
$ 2,050,000
The 1982 return shows a deduction for a management fee of $ 27,000. No partnership returns were filed for Development for tax years after 1982. Additions to Tax
Neither Mr. Bronson nor petitioner timely filed a Federal income tax return for any of the years 1979 through 1983. By letter dated November 27, 1981, the IRS advised Mr. Bronson and petitioner that available records indicated that "you" had income of about $ 103,000 from Financial Strategy Company for 1979. A series of letters, ending with one dated April 28, 1983, from Mr. Bronson to the IRS in response to IRS correspondence, indicates that the IRS requested that he *249 file a return for 1979. In 1982, Mr. Bronson submitted an unsigned Form 1040 for 1979 to the IRS, showing taxable income of $ 54,899.36, the tax on which was eliminated by claimed investment tax credit. On December 28, 1987, Mr. Bronson and petitioner filed a joint income tax return for 1983. In April 1989, Mr. Bronson and petitioner filed joint income tax returns for each of the years 1979, 1980, 1981, and 1982. On the unsigned Form 1040 for 1979 and the returns for 1980, 1981, and 1982, there are claimed deductions relating to the Jackie art masters. The returns for 1980 through 1983 report losses relating to Management, and the returns for 1981 and 1982 report losses relating to Development. In the notice of deficiency mailed to petitioner on December 20, 1990, respondent determined taxable income on the basis of bank records and other financial information. Innocent Spouse
Petitioner claims entitlement to innocent spouse relief under section 6013(e). In this regard, she testified that she asked Mr. Bronson if they had to file returns for the years in issue, to which he responded no because they did not "owe any money". She further testified that she signed the *250 returns prepared by Mr. Bronson because "he handled financial matters, and [she] trusted him". She was aware that they were undergoing an IRS audit for 7 or 8 years. In 1982, Mr. Bronson, petitioner, and their children spent about 2 weeks in Europe. Part of the trip was spent at the Riviera where Mr. Bronson allegedly examined a boat for investment for development of timeshare intervals. Procedural Matters
Pursuant to petitioner's request, the Court instructed the parties to file seriatim briefs, with petitioner filing the first brief by July 20, 1992. Petitioner failed to file a brief. Consequently, respondent did not file a brief. OPINION Petitioner presented little, if any, testimony or other evidence to supplement the record in Bronson I. As a result of her failure to file a brief, and based on the limited allegations in her petition, we can only guess at her positions with respect to each of the issues involved. [4]
*251 Art Masters
In Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we concluded that the investment in Jackie art masters was a "generic tax shelter", devoid of economic substance, and disallowed related depreciation and other deductions, and investment tax credit. In reaching this conclusion, we emphasized the following factors: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form and substance. * * * [Id. at 412.]
In affirming Rose, the Court of Appeals for the Sixth Circuit stated that it was not necessary to label the transaction a "generic tax shelter" because *252 the record fully supported the Tax Court's finding that it was devoid of economic substance. Rose v. Commissioner, 868 F.2d at 853-854. The record here is not sufficiently distinguishable from that in Rose and in other cases involving taxpayers participating in the Jackie art masters program [5] for us to reach a different conclusion. The Jackie promotional materials are replete with illustrations of the tax benefits associated with the Jackie art masters investments. As a promoter for Jackie, Mr. Bronson marketed the art masters and was particularly familiar with the promised tax benefits and their importance to the investment. As in Bronson I, *253 here we conclude that petitioner failed to prove that Mr. Bronson or High Country negotiated price terms with Jackie. Indeed, the total purchase price of the art master remained the same after Mr. Bronson's "discount" as a promoter for Jackie; only the cash paid was affected. Further, petitioner failed to rebut respondent's determination that the art masters were substantially overvalued compared to the underlying tangible property. Respondent's evidence regarding valuation was far more convincing than the evidence presented by Mr. Bronson in Bronson I. We see no purpose in reiterating the full analysis in Bronson I regarding the valuation evidence. We agree with the analysis and incorporate it here. The evidence indicates that Mr. Purcell received $ 3,000 cash and a $ 165,000 nonrecourse note for each art master from Jackie. There were no payments on the nonrecourse notes. In comparison, High Country purchased the Purcell art masters, Freighter and Dreams of Eldorado, from Jackie at prices of $ 315,000 and $ 265,000, respectively. There was no evidence in the record of the cost to Jackie of Dead Giveaway. To the extent established, the cost of the art masters to Jackie was *254 considerably below the resale price. Finally, the bulk of the consideration from Mr. Bronson or High Country to Jackie was in the form of nonrecourse long-term notes. Mr. Bronson testified that this was "essentially a form of equity more than it was debt". He acknowledged that it was not expected to be paid. He also testified that even if all of the prints in the limited edition were sold, after marketing fees, this would not cover the amount of the recourse portion of the notes. Additionally, Jackie routinely offered to forgive the "recourse" liabilities if the investor returned unsold art masters and limited edition prints. And Mr. Bronson received such an offer from Jackie. Petitioner's testimony regarding this issue did more harm to her case than good. She characterized Mr. Bronson's purchase of Dead Giveaway as a "tax shelter". She acknowledged that the net profit which could be realized from the sale of all of the limited edition prints of each art master was less than $ 30,000. In summary, we are satisfied that the investments in Jackie art masters lacked economic substance and do not entitle Mr. Bronson and petitioner, either directly or through High Country, to *255 related depreciation or other deductions, or investment tax credits. Timeshare Partnerships
Petitioner did not present here any evidence additional to that presented in Bronson I or make any arguments with regard to Management, Marketing, or Development. We agree with and thus here incorporate the analysis and conclusions reached in Bronson I. As to the losses relating to Management and Marketing reported on Mr. Bronson's and petitioner's joint returns for 1980 through 1983, we concluded in Bronson I that (1) Mr. Bronson failed to show that he had any adjusted basis in his Management stock or indebtedness of Management to him and was not entitled to deduct losses passed through from Management under section 1374(c)(2) for 1980, 1981, and 1982 and section 1366(d)(1) for 1983, and (2) he failed to show that he was an individual limited partner in Marketing entitled to a distributive share of its losses from IVR or Management fees. As to losses relating to Development reported on Mr. Bronson's and petitioner's joint returns for 1981 and 1982, we concluded that he was not entitled to deduct losses as a limited partner in Development because to the extent that the underlying *256 marketing fees and other expenses were incurred for the tax years 1981 and 1982, Development was not yet in the trade or business of developing and selling timeshare intervals under section 162, but was in a preoperational phase. [6] We agree with and thus here incorporate the full analysis supporting these conclusions as set forth in Bronson I; the analysis and conclusions are equally applicable to petitioner. Additions to Tax
Apart from the deficiency notice mailed to her, petitioner submitted no evidence in addition to that introduced by Mr. Bronson in Bronson I, and made no arguments with respect to the additions to tax determined by respondent. Section 6651(a)(1) imposes an addition to tax for failure to timely file a return, unless the taxpayer establishes that the *257 failure was due to reasonable cause and not willful neglect. The addition equals 5 percent of the tax required to be shown on the return for the first month, with an additional 5 percent for each additional month or fraction of a month during which the failure to file the return continues, not to exceed a maximum of 25 percent. The burden of showing reasonable cause rests with petitioner. Rule 142(a). In Bronson I, we concluded that Mr. Bronson was liable for the addition to tax under section 6651(a)(1), rejecting his contention that he had reasonable cause because "someone" in the IRS told him that he did not have to file a return if he did not have income. We agree with and thus here incorporate the analysis and conclusion in Bronson I. Accordingly, we sustain respondent's determination that petitioner is liable for the addition to tax under section 6651(a)(1). Section 6653(a) for 1979 and 1980, and section 6653(a)(1) for 1981 through 1983, provide for an addition to tax of 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes a further addition to tax equal *258 to 50 percent of the interest due on the portion of the underpayment attributable to the negligence for taxes due after December 31, 1981. Negligence is the lack of due care, or the failure to do what a prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of establishing that the negligence addition to tax does not apply. We concluded in Bronson I that Mr. Bronson failed to show that any part of the underpayment was not due to negligence or intentional disregard of the rules and regulations. We agree with and reach the same conclusion as to petitioner. Thus, respondent's determination that petitioner is liable for the additions to tax under section 6653(a) for 1979 and 1980, and under section 6653(a)(1) and (2) for 1981 through 1983, is sustained. Section 6654 provides for an addition to tax for underpayment of estimated tax by a taxpayer. Mr. Bronson and petitioner had tax liabilities for each of the years 1979 through 1983. Respondent determined that no estimated tax payments were made for any of the years in issue, and the record does not include any evidence of such *259 payments. In Bronson I, we concluded that Mr. Bronson failed to show that he met any of the exceptions to the addition to tax set forth in section 6654(d). Reaver v. Commissioner, 42 T.C. 72, 83 (1964). Likewise, here we reach a similar conclusion with respect to petitioner. Accordingly, respondent's determination that petitioner is liable for additions to tax under section 6654(a) for each of the years in issue is sustained. Innocent Spouse
Under section 6013(d)(3), if a husband and wife file a joint tax return for a year, then "the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several". Section 6013(e)[7] relieves a spouse of all or part of the joint return liability if certain requirements are met. *260 In order to qualify for relief for the years in issue, petitioner must show that: (1) Mr. Bronson and she filed joint tax returns; (2) on the returns there is a substantial understatement of tax; (3) the substantial understatement of tax is attributable to "grossly erroneous items"; (4) the "grossly erroneous items" are items of Mr. Bronson; (5) in signing the returns, she did not know, and had no reason to know, of the substantial understatement; and (6) considering all the facts and circumstances, it is inequitable to hold her liable for the deficiency attributable to the substantial understatement. See Estate of Simmons v. Commissioner, 94 T.C. 682, 683 (1990); Purcell v. Commissioner, 86 T.C. 228, 234-235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). If the "grossly erroneous items" are claims for deductions, credits, or basis, they must have "no basis in fact or law" and exceed a certain percentage of the adjusted gross income for the "preadjustment year" (her most recent taxable year ending before the date the deficiency notice was mailed). Sec. 6013(e)(2)(B), (4). In deciding whether *261 it is equitable to hold petitioner liable for the deficiency, an important consideration is whether she benefited significantly from the understatement of tax; "normal" support is not a significant benefit. See sec. 1.6013-5(b), Income Tax Regs.
Petitioner bears the burden of showing that she satisfied each of the statutory requirements to be relieved of liability. Bokum v. Commissioner, 94 T.C. 126, 138 (1990). The record does not provide the adjusted gross income for 1989, the preadjustment year. Additionally, petitioner traveled to Europe, including the Riviera, for 2 weeks in 1982, which appears to be a benefit beyond "normal" support. On this record, we conclude that petitioner failed to show that (1) the underpayment attributable to the "grossly erroneous items" ("deductions, credits, or basis") exceeded the required percentage of her preadjustment year adjusted gross income, and (2) it would be inequitable to hold her liable for such underpayment. Thus, we conclude that she is not entitled to be relieved of liability for any of the years in issue under section 6013(e). To reflect the concessions by respondent, Decision will be entered *262 under Rule 155. Footnotes
2. Interest on the underpayment attributable to tax-motivated transactions, accruing after Dec. 31, 1984, at 120 percent of the normal underpayment rate.↩
1. 50 percent of the interest due on the portion of the underpayment attributable to negligence.↩
1. The 1980 return contains an unclear notation as follows: ↩
80610
Rocky Mt Freighter (increased recourse note)
91000
Dreams of Eldorado I & II recourse notes
5000
cash
176,610
x .75
132,458
+
4050 = 136508
computer 2. A footnote to the $ 23,102 amount states: ".75 of $ 30802."↩
3. The Marketing/IVR agreement was signed on behalf of Marketing by Mr. Bronson as president of Resort Timeshare, Inc. which was characterized as the general partner of Marketing.↩
4. In the petition, petitioner alleged that respondent should be estopped from joining her as a party in Bronson I based on several procedural arguments. However, she was not joined as a party.↩
5. Bronson I; Mandelbaum v. Commissioner, T.C. Memo. 1990-223; Ballard v. Commissioner, T.C. Memo. 1988-436; Estate of Murray v. Commissioner, T.C. Memo. 1987-602; cf. Gangel v. Commissioner, T.C. Memo. 1991-358↩.
6. In Bronson I, we also concluded that Mr. Bronson's capital contribution to Development was $ 10,000 and his distributive share of allowable losses, if any, from Development would be limited to $ 10,000 under secs. 465(a) and (b) and 704(d).↩
7. The applicable statute for the years in issue is sec. 6013(e)↩ as amended retroactively to all open years to which the Internal Revenue Code of 1954 applies by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 242(a) and (c), 98 Stat. 494, 801-802, 803.